**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

SARKISSIAN MASON, INC., a Michigan
corporation, and AUTOMATIC, LLC, a Delaware
Limited Liability Company,

                    Plaintiffs,

                    v.

ENTERPRISE HOLDINGS, INC., a Missouri
corporation,

                    Defendant.

-----------------------------------------------------------------x

Case No. 11 CV 9472 (LGS)
Hon. Lorna G. Schofield

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION AND MEMORANDUM FOR**
**SUMMARY ADJUDICATION OF ISSUES AND SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND............................................................................................ 1

   I.    THE NON-DISCLOSURE AGREEMENT ...................................................... 1

   II.   PLAINTIFFS' CONCEPT......................................................................................... 2

   III.  DEFENDANT'S MISAPPROPRIATION OF PLAINTIFFS' CONCEPT ...................... 4

   IV.  THE STRATEGIC RELATIONSHIP AGREEMENT ...................................... 6

   V.   ON RAMP ..................................................................................................... 8

ARGUMENT ................................................................................................................... 9

DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION OF THE ISSUES AND SUMMARY JUDGMENT SHOULD BE DENIED IN ITS ENTIRETY ................................... 9

Standard of Review........................................................................................................ 9

   I.    EHI BREACHED THE NONDISCLOSURE AGREEMENT........................................ 10

       A.  The Non-Disclosure Agreement Protects SM's Mobile Engagement Concept.......... 10

       B.  EHI Used and Disclosed Plaintiffs' Confidential Information ................................... 10

           1.  The Pilot Programs ............................................................................. 10

           2.  OnRamp ..................................................................................................... 11

       C.  The Exceptions to the Definition of "Confidential Information" Do Not Apply ...... 12

           1.  SM's Mobile Engagement Concept Was Not Part of the Public Domain ............ 12

           2.  EHI Did Not Possess or Independently Develop SM's Concept........................... 13

           3.  SM Did Not Waive Confidentiality ................................................................. 14

           4.  The Destination Website........................................................................ 15

       D.  There Are Genuine Issues of Material Fact Regarding EHI's Misappropriation of SM's Mobile Engagement Concept .......................................................... 16

   II.   EHI MISAPPROPRIATED PLAINTIFFS' TRADE SECRET ...................... 17

   III.  EHI ENGAGED IN FRAUD AND/OR MISREPRESENTATION ................ 18

   IV.  PLAINTIFFS' HAVE STATED EQUITABLE CLAIMS FOR RELIEF........................ 20

       A.  Unjust Enrichment and Quantum Meruit................................................... 20

       B.  Promissory Estoppel and Equitable Estoppel ........................................... 20

   V.   PLAINTIFFS HAVE ESTABLISHED SUBSTANTIAL DAMAGES ........................ 21

A.  The SM Concept Has Economic Value ...................................................................... 21

B.  The Economic Value Can Be Measured With Reasonable Certainty ......................... 23

C.  Other Damages .......................................................................................................... 24

CONCLUSION AND RELIEF REQUESTED ............................................................................ 25

# **TABLE OF AUTHORITIES**

**Cases**

*Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50 (Mo. 2005) ................... 23

*Baskett v. United States*, 8 Cl. Ct. 201 (1985) *aff'd*, 790 F.2d 93 (Fed. Cir. 1986) ..................... 10

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir. 1996). ... 19, 20

*Gasser v. John Knox Village,* 761 S.W.2d 728 (Mo.App.1988)................................................... 24

*Glenn v. HealthLink HMO, Inc.,* 360 S.W.3d 866 (Mo.App. E.D.2012) .................................... 21

*Hanna v. Darr,* 154 S.W.3d 2 (Mo.App. E.D.2004) ................................................................... 21

*ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371 (Mo. 1993) ....... 9

*Popoalii v. Corr. Med. Services*, 512 F.3d 488 (8th Cir. 2008).................................................. 10

*Reed v. U.L.S. Corp.*, 178 F.3d 988, 990 (8th Cir. 1999) .............................................................. 9

*Ridgely's Estate v. United States*, 180 Ct. Cl. 1220 (1967) ........................................................ 10

**Statutes**

Mo. Rev. Stat. § 417.450 ............................................................................................................. 17

Defendant's Motion for Summary Adjudication of Issues and Summary Judgment is a thinly-veiled attempt to distract this Court from Defendant's calculated scheme to mislead Plaintiffs and misappropriate their unique mobile engagement/buying service concept and rebrand it for its own benefit. Notwithstanding Defendant's repeated assertions that it had already formulated the concept before it was presented by Plaintiffs, its own internal documents and the deposition testimony of its own executives, together with the Report of Plaintiffs' mobile marketing expert, all establish exactly the opposite. Defendant's clumsy effort to explain away this evidence with extensive, post-discovery statements by the very same executives cannot change the inescapable truth of its breathtakingly dishonest behavior.

## FACTUAL BACKGROUND

## I.    THE NON-DISCLOSURE AGREEMENT

Plaintiffs, Sarkissian Mason, Inc. and its subsidiary, Automatic LLC (collectively "SM"), comprise a highly successful mobile marketing advertising agency. (Pl.'s Ex. 1: Sarkissian Dep. at 393-396)[1] Defendant, Enterprise Holdings, Inc. ("EHI"), is the largest rental car company in the world. During 2010, EHI supplied rental vehicles for an overnight test drive program that SM implemented for the Lincoln division of the Ford Motor Company. (Def.'s SMF at ¶70) In October 2010, SM and EHI entered into a Non-Disclosure Agreement that provided as follows:

> Subject to the terms and conditions of this Agreement, the Receiving Party hereby agrees forever (a) to hold all of the Confidential Information of the Disclosing Party in strict confidence and to take reasonable precautions to protect all of the Confidential Information of the Disclosing Party including, without limitation, taking all precautions the receiving Party employs with respect to its most confidential information and materials, (b) not to disclose any of the Confidential Information of the Disclosing Party or any information derived therefrom to any

---

[1] Exhibits cited herein are either attached to the Declaration of Joel D. Smith in Support Of Defendant's Motion for Summary Judgment ("Def.'s Ex.") or to the Declaration of Melissa Wojnar-Raycraft in Support of Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Ex.").

third person, (c) not to make any use whatsoever at any time of any of the Confidential Information of the Disclosing Party except to evaluate internally whether to enter into the currently contemplated business relationship with the Disclosing Party, and (d) not to copy or disassemble, or otherwise reverse engineer any Confidential Information of the Disclosing Party. (Def.'s Ex. 8: NDA at ¶2)

The NDA defined "Confidential Information" broadly to include information about the Disclosing Party's "intellectual property, including technical drawings, know-how, formulas, processes, ideas, inventions (whether patentable or not), products, product development plans, services, forecasts, strategies and information." *Id*. at ¶1.

## II.    PLAINTIFFS' CONCEPT

Following execution of the NDA, SM worked exclusively with Jeff Morrell, EHI's Vice President of Business Development. (Pl.'s Ex. 1: Sarkissian Dep. at 399) Mr. Morrell asked SM to develop a vehicle test drive program that would take advantage of EHI's dominance of the insurance replacement market. (Pl.'s Ex. 30: von Zelowitz Report at 6) Accordingly, SM initially presented proposals to develop a program similar to the Lincoln test drive program, but Mr. Morrell suggested instead that SM develop a different concept to "monetize" EHI's insurance replacement business. (Pl.'s Ex. 1: Sarkissian Dep. at 20-21, 37, 40, 62) In an April 13, 2011, PowerPoint presentation to EHI, SM confirmed its mission "[███████████████████████████████ ██████████████████████████████████████████████████.**" (Def.'s Ex. 21: 1st PPT) After that presentation, Mr. Sarkissian told Mr. Morrell that "[w]e are going to put our time into defining each step of the process and get back to you with a very tight presentation/proposal on where this can go." (Pl.'s Ex. 2: 4/13/11 Sarkissian Email to Morrell)

Over the next several weeks, SM developed an entirely new concept: a buying service using "mobile engagement" technology to connect renters and vehicle manufacturers (called "OEMs") for the purpose of generating new car sales for OEMs. SM proposed placing computer

codes (Quick Response Codes or "QR Codes") in EHI's vehicles that renters could scan using their smartphones. The scans would lead renters to engaging content specifically designed to persuade them to purchase the same model as the cars they were driving.

Calling the new mobile engagement concept the "AutoMatic Buying Service" ("ABS"), SM developed a series of PowerPoint presentations that it provided to EHI during May and June 2011. (Pl.'s Ex. 3: Privitelli Dep. at 71-74, 76, 91; Def.'s Exs. 21-24: PPTs #1-4; Pl.'s Ex. 5: PPT #5, Pl.'s Ex. 6: PPT #6)  One of those slides helps to illustrate the concept:



(Pl.'s Ex. 6: PPT #6 at SM000110)

The initial version of ABS envisioned connecting EHI renters to an SM-created website featuring custom content, with SM and EHI sharing revenue from OEMs for each sales "lead" generated by the program. (Pl.'s Ex.  3: Privitelli Dep. at 81-82, 92)

## III.  DEFENDANT'S MISAPPROPRIATION OF PLAINTIFFS' CONCEPT

Notwithstanding disagreement regarding some of the logistics of implementing SM's buying service, on June 1, 2011, Mr. Morrell wrote to Jim Runnels, EHI's Senior Vice President for Rental Vehicles, attaching SM's PowerPoint and declaring EHI's plan to implement it:

> [H]ere is the PPT I plan to go over with him [Jim]. **We essentially plan to use this strategy to enable the OEMs that partner with us to interact with our renters while they are still in cars. It takes the product exposure concept and accelerates it tremendously and it is all trackable for us.** (Pl.'s Ex. 7, emphasis supplied)

Mr. Morrell testified that "accelerates" referred to the fact that SM's buying service concept permitted EHI renters to engage with OEMs while they were renting the cars. (Pl.'s Ex.  4: Morrell Dep. at 151-152) This was a key element of SM's mobile engagement concept.

On the same day, Mr. Morrell also informed Susan Lombardo, EHI's Vice President of Fleet Operations, that EHI was going forward with SM's concept, though this time he did not mention the SM PowerPoint presentation and took credit for the idea as his own:

> QR Code / In vehicle marketing:  I've completed a strategy for using QR codes to enable customer feedback, sales requests and electronic marketing materials to be delivered to consumers while in vehicles. AutoMatic can support completely. I'm simply waiting on a business plan from AutoMatic with associated costs. (Pl.'s Ex.  8: Morrell's May 2011 End of Month ("EOM") Report)

At no time did anyone at EHI indicate to anyone at SM that EHI previously had the idea for SM's buying service concept. (Pl.'s Ex. 1: Sarkissian Dep. at 22, 120-121; Pl.'s Ex. 4: Morrell Dep. at 123)

Unknown to Plaintiffs, during June and July EHI presented SM's mobile engagement concept to Mazda, one of EHI's customers, as part of an existing program to purchase Mazda vehicles for the insurance replacement market. (Pl.'s Ex. 4: Morrell Dep. at 182-186; Pl.'s Ex. 9: 7/13/2011 Mazda Agenda)  Ms. Lombardo confirmed in an email to Mr. Morrell that she had

presented SM's mobile engagement concept to Mazda: "[w]e briefly discussed the QR code strategy (which you had already broached with them) so they are ready and willing to be a test case." (Pl.'s Ex. 10: 7/1/2011 Lombardo Email)

On July 1, 2011, Brenda Perez, Ms. Lombardo's counterpart at Mazda, wrote to her colleagues that: "Susan also mentioned that they've held internal discussions on partnering with one or two OEMs on a new joint marketing project using QR technologies." (Pl.'s Ex. 11: 7/1/2011 Perez Email) A week later, Ms. Perez wrote to Christopher Hill, Mazda's Group Manager of Marketing Operations, that "Sarkissian Mason has also made a proposal to Enterprise to develop QR codes/stickers that will send the user to an Enterprise site. …Enterprise sees this as an unnecessary expense if a QR code can be developed that would send the user to the OEM's site." (Pl.'s Ex. 12: 7/8/2011 Perez Email) Ms. Perez specifically noted that SM's idea was confidential: **"This update is confidential as Enterprise is still in discussions with SM."** (*Id.*, emphasis supplied)

Mazda agreed to move forward with SM's mobile engagement concept and to place QR Codes on all of the vehicles in the EHI program. (Def.'s Exs. 7 & 17) EHI also entered into a Confidentiality Agreement with another marketing agency to implement SM's buying service. (Pl.'s Ex. 14: Agreement) All of this took place at the same time that Mr. Morrell was expressing skepticism to SM that any OEM would be interested in SM's mobile engagement concept, even challenging SM to find an OEM who would implement the concept. (Pl.'s Ex. 1: Sarkissian Dep. at 70-73; Pl.'s Ex. 13: Morrell & Privitelli July 2011 Emails) Mr. Sarkissian, in a remarkable display of prescience, was reluctant to bring OEMs to EHI without an agreement in place regarding implementation of the SM concept. (Pl. Ex. 1: Sarkissian Dep. at 72-73, 100-101, 233)

## IV.    THE STRATEGIC RELATIONSHIP AGREEMENT

Later in July, Mr. Morrell told SM that EHI wanted to proceed with SM's mobile engagement concept and asked SM to draft a Strategic Relationship Agreement ("SRA"). (Pl.'s Ex. 1: Sarkissian Dep. at 76, 135-136) The question of whether the Agreement would include the construction of a new website was still under discussion: Mr. Morrell and Mr. Privitelli exchanged emails in which Mr. Privitelli emphasized that SM was willing to implement the mobile engagement concept in whatever fashion the OEMs desired. (Pl.'s Ex. 4: Morrell Dep. at 188-189; Pl.'s Ex. 13: Morrell & Privitelli July 2011 Emails; Pl.'s Ex. 15: 8/16/2011 Privitelli Email) Mr. Privitelli maintained, however, that once the program was underway the OEMs would understand the desirability of such a site and the additional content it would supply. *Id.*

SM presented the draft SRA to EHI in mid-August. (Def.'s Ex. 26) Mr. Morrell informed Mr. Privitelli repeatedly throughout the remainder of August that the draft was being reviewed by EHI's legal staff. (Pl.'s Ex. 4: Morrell Dep. at 232-233) But this was not true: Mr. Morrell did not even forward the SRA to his superior, Ms. Lombardo, until September 2, 2011, *two weeks after* receiving the proposed agreement. *Id.* at 230-231. Tellingly, he confided to Ms. Lombardo his worry that SM might sue EHI for misappropriating SM's mobile engagement concept: "Here you go. I'm not sure if these guys are looking to partner with us, **or claim the idea and sue us**." (Pl.'s Ex. 16: 9/2/11 Morrell Email, emphasis supplied) No wonder: Mr. Morrell also informed Ms. Lombardo that he had presented the "OEM Mobile Marketing Project" to Volkswagen, BMW, Toyota, Fiat, Ford and Nissan during August and September. (Pl.'s Ex. 17: August 2011 EOM Report; Pl.'s Ex. 36, September 2011 EOM Report)

In response to increasingly urgent inquiries from Mr. Privitelli, the parties held a telephone conference call in late September among Mr. Privitelli, Howard Sohn (SM

Program/Analytics Manager), Mr. Morrell, Ms. Lombardo, Heather Buchta (SM's attorney), and EHI's General Counsel. (Pl.'s Ex. 3: Privitelli Dep. at 113-114; Pl.'s Ex. 4: Morrell Dep. at 240-245) Mr. Privitelli took contemporaneous notes during the call and circulated an email summary to Mr. Sarkissian the next morning. He noted that EHI "still supports and believes in the concept overall" and that it "will provide more specific feedback in writing by the end of next week on what they are willing to do from an agreement and business perspective and how it should be structured going forward." (Pl.'s Ex. 18: 9/30/2011 Privitelli Email)

But EHI never provided the promised written feedback on the SRA. Mr. Morrell understood that "we owed them a document" and on October 10, 2011 finally responded to an inquiry from Mr. Privitelli regarding "next steps for the agreement" by stating that he was preparing written feedback "explaining what we can do based on our understanding of the market today." (Pl.'s Ex. 19: 10/10/2011 Morrell Email). Then, on November 1, 2011 Mr. Morrell informed SM that EHI was ready to publicly announce the parties' new mobile marketing effort. (Pl.'s Ex. 4: Morrell Dep. at 256-258; Pl.'s Ex. 20, 11/1/2011 Privitelli Email: "Jeff, Thanks for the update regarding ERAC's decision to proceed with the ABS concept that we have shared with you and the team. I have updated Patrick regarding our call and we are both very encouraged by your commitment to see this unique idea through.") Mr. Sarkissian wrote to Mr. Morrell "AWESOME news that we are moving forward, it's the right thing. It will be great value to your relationships with the OEM's, we are positive of it!" Mr. Morrell replied "Agreed. We'll talk soon." (Pl.'s Ex. 21: 11/1/2011 Morrell Email) As late as November 7, 2011 Mr. Morrell assured Mr. Privitelli:

> **We're about done with our proposed agreement. I think everyone has signed off on it.** What I have to do now is get our bosses up to speed, which I think is just a courteous formality. This will not be anything new for them. I'm trying to

get on their calendars by tomorrow. (Pl.'s Ex. 22: 11/7/2011 Morrell Email)[2]

In fact, EHI's scheme to misappropriate SM's mobile engagement concept for its entire rental fleet had already been underway for months. All that remained was the public announcement, only one day away.

## V.     ON RAMP

On November 8, 2011 EHI announced to the national media that it was launching OnRamp, a mobile engagement concept that would place scannable codes in its rental cars to connect renters to OEMs to boost new vehicle sales. (Pl.'s Ex. 23: 11/8/2011 Press Release) EHI declared OnRamp to be "a new industry-leading program" and announced its intention to implement OnRamp across its entire rental fleet of "nearly 1 million vehicles throughout North America." Trumpeting the fact that EHI "is the first car rental company to create a comprehensive QR code-based renter engagement campaign", EHI described the key elements:

> Scanning the QR code with a smartphone launches a mobile-optimized site where car rental customers can learn more about the vehicles they are renting, find a local dealer if they are interested in purchasing a similar car to the one they are driving, and more. …OnRamp exposes the thousands of renters who are likely looking for a new vehicle to a new experience that extends beyond the rental transaction and puts a spotlight on vehicles from our manufacturing partners….

Incredibly, EHI continued to string SM along: Mr. Morrell wrote to Mr. Privitelli that: "I apologize for how slow we're moving. Getting everyone to sign off is not easy. **We'll get there**." (Pl.'s Ex. 24: 11/10/2011 Morrell Email) When confronted by SM, EHI claimed that it had misappropriated nothing because OnRamp was an entirely different program. (Pl.'s Ex. 25: 12/21/2011 Laffey Letter) EHI claimed that it had rejected the draft SRA but was willing to

---

[2] Significantly, EHI has taken steps to place Mr. Morrell in its own version of the witness protection program. Although he was EHI's main (and often only) contact with SM from the start, he is not mentioned in EHI's Brief, his deposition testimony is not cited, and EHI has not presented a new declaration from him (as it has with Ms. Lombardo and Mr. Howell, who had virtually no contact with SM). This is no accident: Mr. Morrell was the point man for EHI's misappropriation of SM's mobile engagement concept and his emails and deposition testimony present a damning picture of EHI's conduct.

explore a letter of intent for a pilot program with Chrysler. (*Id.*; *see also* Def.'s Ex. 10) The testimony of Mr. Privitelli, Mr. Sarkissian, and even Mr. Morrell, however, establishes that EHI never rejected the SRA and that it concocted the other program after the fact in order to justify its misappropriation of SM's mobile engagement concept. (Pl.'s Ex. 1: Sarkissian Dep. at 277, 297-299; Pl.'s Ex. 3: Privitelli Dep. at 178; Pl.'s Ex. 4: Morrell Dep. at 244-245, 256-257)

Plaintiffs filed this action in December 2011. In January 2012 Ms. Lombardo noted that EHI had decided to enhance OnRamp by creating its own content, "a more robust customer offering" beyond a "just a link to a manufacturer site." (Pl.'s Ex. 26: 1/30/2012 Lombardo Email) Not surprisingly, OnRamp now connects renters to a web site created and hosted by EHI, not directly to the OEMs' sites, just as SM advocated from the outset. (Pl.'s Ex. 27: 10/23/2012 Press Release; Pl.'s Ex. 28: OnRamp Concierge landing page)

## ARGUMENT

### DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION OF THE ISSUES AND SUMMARY JUDGMENT SHOULD BE DENIED IN ITS ENTIRETY

#### Standard of Review

It is well established that when ruling on a motion for summary judgment, the court should view the facts in the light most favorable to the adverse party and allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Reed v. U.L.S. Corp.*, 178 F.3d 988, 990 (8th Cir. 1999). A genuine issue of material fact exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. 1993). Here, the evidence, including thousands of documents, ten depositions, more than 160 deposition exhibits, and now two new, extensive declarations from *already deposed* EHI

executives,[3] supports just such plausible and contradictory accounts of the disputed facts. Moreover, EHI has offered *no* expert testimony to rebut the Report and expert testimony of Plaintiffs' mobile marketing expert.[4] Summary judgment is unwarranted and unjustifiable in these circumstances.

## I.  EHI BREACHED THE NONDISCLOSURE AGREEMENT

### A.  The Non-Disclosure Agreement Protects SM's Mobile Engagement Concept

For purposes of its Motion, EHI admits that the parties' NDA protects SM's mobile engagement concept. Mr. Sarkissian confirmed that the NDA was intended to protect all of SM's confidential information (Pl.'s Ex. 1: Sarkissian Dep. at 56), and Plaintiffs' mobile marketing expert, Nils von Zelowitz, has agreed. (Pl.'s Ex. 29: von Zelowitz Dep. at 116, 175, 246)

### B.  EHI Used and Disclosed Plaintiffs' Confidential Information[5]

#### 1.  The Pilot Programs

EHI's first violation of the NDA came only weeks after SM's PowerPoint presentations describing SM's buying service/mobile engagement concept. In a July 2011 discussion and related email exchange with Brenda Perez, Mazda's Vice President of Fleet Operations, Susan

---

[3] For obvious reasons, a court can reject an affidavit which contradicts previous deposition testimony. *Popoalii v. Corr. Med. Services*, 512 F.3d 488, 498 (8th Cir. 2008) ("[T]estimony under oath ... can[not] be abandoned many months later by the filing of an affidavit." ).

[4] Uncontradicted testimony of an expert is persuasive and the lack of rebuttal evidence operates against the defendant's contentions. *Baskett v. United States*, 8 Cl. Ct. 201, 225 (1985) *aff'd*, 790 F.2d 93 (Fed. Cir. 1986) *citing* 11 J. Moore, Moore's Federal Practice, § 702.301 (2d ed. 1982); *see also Ridgely's Estate v. United States*, 180 Ct. Cl. 1220, 1232 (1967) ("The lack of such evidence [rebutting expert testimony] operates against the defendant's contentions.").

[5] EHI argues that Messrs. Sarkissian and von Zelowitz "have taken extreme positions in bad faith that are contrary to law" in an attempt to avoid summary judgment. (Brief at 4) Despite the seriousness of this charge, EHI has made no attempt to cite facts that demonstrate bad faith. Both Mr. Sarkissian and Mr. von Zelowitz did their best to answer deposition questions regarding what constitutes confidential information under the NDA, emphasizing that they are not attorneys and despite the fact that EHI's counsel bullied Mr. von Zelowitz into testifying on a complex exhibit without permitting him an opportunity to review it. (Pl.'s Ex. 1: Sarkissian Dep. at 303-305, 322; Pl.'s Ex. 29: von Zelowitz Dep. at 146-148) Mr. von Zelowitz later testified that "██████████████████████████████████████████████████████████████████████ " *Id*. at 268.

Lombardo disclosed SM's mobile engagement concept and proposed incorporating the concept into EHI's proposal to add thousands of Mazda vehicles to its rental fleet. *See* pp. 4-5 *supra.* Significantly, Ms. Lombardo specifically credited the mobile engagement concept to SM and carefully advised Ms. Perez that the concept was confidential because EHI was in negotiations with SM. *Id.* Mr. Morrell then disclosed SM's mobile engagement concept to several other major OEMs during the remainder of July, August, and September 2011. *See* p. 6, *supra*.

2. <u>**OnRamp**</u>

EHI's second violation of the NDA came when it rebranded SM's mobile engagement concept and launched it under the name OnRamp in November 2011. OnRamp openly used and disclosed SM's confidential information: EHI itself describes OnRamp as a program that places QR codes in its rental vehicles to drive purchases of the vehicles. (Pl.'s Ex. 23: 11/8/2011 Press Release) Even Mr. Morrell admitted that mobile engagement was at the heart of OnRamp. ("█████████████████████████████████████████████████████████████." Pl.'s Ex. 4: Morrell Dep. at 264)

Moreover, Mr. von Zelowitz concluded in his Report and repeatedly in his deposition testimony that EHI's OnRamp program itself constitutes both use and disclosure of SM's confidential information: "███████████████████████████████████████████████ ████████████████████████████████████████████████████████████" and that "███████████████████████████████████████████████████ ██████████████████████████████████." (Pl.'s Ex. 30: von Zelowitz Report at 10, 13; *see also* Pl.'s Ex. 29: von Zelowitz Dep. at 108-109, 111, 130, 139, 253-55, 261) EHI has proffered no expert testimony of its own to counter Mr. von Zelowitz's opinion. *See* footnote 4, *supra*.

EHI relies on exceptions in the NDA regarding the definition of Confidential Information to excuse its misappropriation of SM's buying service/mobile engagement concept. (Def.'s Ex. 8, NDA at ¶1 (a) through (d)). Unfortunately for EHI, none of the exceptions apply in this case.

### 1.    SM's Mobile Engagement Concept Was Not Part of the Public Domain

SM's mobile engagement concept was unquestionably new when it was presented to EHI and was not previously known publicly. SM's mobile marketing expert has opined that the concept is "█████████████████" and an "█████████████████." (Pl.'s Ex. 30: von Zelowitz Report at 6-7) "████████████████████████████████." *Id.* at 7.



*Id.* at 12-13.

Moreover, EHI itself declared that the concept was "industry-leading" when it announced the OnRamp program in November 2011, declaring that EHI "is the first car rental company to create a comprehensive QR code-based renter engagement campaign". (Pl.'s Ex. 23: 11/8/2011 Press Release) EHI's assertion that because certain elements of SM's mobile engagement concept were publicly known the entire concept was in the public domain also defies common sense and expert opinion:



(Pl.'s Ex. 30: von Zelowitz Dep. at 229; *see also* 232: "██████████████████████.")

## 2. EHI Did Not Possess or Independently Develop SM's Concept

The facts similarly establish that EHI was not aware of SM's mobile engagement concept before it was presented by SM. EHI places all of its eggs in the repeated invocation of Mr. Morrell's January 2011 presentation to Chrysler suggesting the use of bar codes on vehicle key tags. (Pl.'s Ex. 31: PPT Slide #10 with explanatory notes) Far from establishing as a matter of law that EHI formulated SM's buying service concept before SM, that presentation proves that EHI was never able put together the individual elements into the concept on its own:

- The only reference in the text is to bar codes, not QR Codes: the former cannot lead to external websites, whether OEM sites or sites built by SM or EHI.

- Mr. Morrell confessed a complete lack of knowledge regarding computer codes at the time of the presentation, including whether bar codes or QR Codes can lead to external websites. (Pl.'s Ex. 4: Morrell Dep. at 33-36)

- The presentation's reference to a "[w]eb address for vehicle details" acknowledges that the codes were never intended to lead renters to any external website. If they were, there would be no reason to cite the web address at all.

- Instead, Mr. Morrell testified that the bar code and web address were intended only to lead renters to information about features and operation of the rental car, potentially replacing written materials EHI placed in its vehicles. (Pl.'s Ex. 4: Morrell Dep. at 36, 45, 110)

- The image of the QR Code was pasted in by Mr. Morrell as the result of a Google search and is referenced nowhere else in the presentation. (Pl.'s Ex. 4: Morrell Dep. at 66-67) Mr. Morrell still did not understand what a QR Code was at that time. (Pl.'s Ex. 1: Sarkissian Dep. at 24; Pl.'s Ex. 30: von Zelowitz Report at 12)

- Neither Mr. Morrell nor anyone else at EHI ever mentioned the January presentation to SM or ever claimed that EHI had developed SM's concept first. (Pl.'s Ex. 1: Sarkissian Dep. at 22, 33, 120; Pl.'s Ex. 4: Morrell Dep. at 123-124)

- When Mr. Morrell presented SM's mobile engagement concept to Mr. Runnell in early June 2012 he attached the SM PowerPoint and did not attach or even mention this Chrysler presentation. (Pl.'s Ex. 7, 6/1/2011 Morrell Email)

- Mr. von Zelowitz, SM's mobile marketing expert, opined that the January 2011 presentation did not propose using QR Codes to connect renters to outside websites or

SM's concept (Pl.'s Ex. 29: von Zelowitz Dep. at 93, 111, 207, 230, 233)

Significantly, EHI has presented no evidence that it had the idea to use any type of scannable code to create a car buying service. *The post-discovery declarations of its executives cannot change this basic truth.* While Mr. von Zelowitz agreed that EHI was aware of some limited elements of SM's mobile engagement concept, including the potential use of QR Codes, he was absolutely clear that the concept consists of a unique combination of elements, something that was unknown to EHI before it was proposed by SM:

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████. (Pl.'s Ex. 29: von Zelowitz Dep. at 108-09)

Mr. von Zelowitz testified that it was "the sum of the parts" that constituted SM's mobile engagement concept and that EHI never understood "the totality of the idea" before it was presented by SM. *Id.* at 229, 232.

### 3.  SM Did Not Waive Confidentiality

Contrary to EHI's mischaracterizations, the record establishes that SM took substantial measures to protect the secret nature of its mobile engagement concept. At the very outset of the parties' relationship, SM entered into the NDA with EHI to protect the confidentiality of its intellectual property. As previously noted, *all* of SM's ideas, including the mobile engagement concept, and all of its presentations regarding the concept, were protected by the NDA.

EHI cites Mr. Sarkissian's discussions with executives at OEMs and other advertising agencies in the absence of confidentiality agreements as evidence of a waiver. But those discussions took place at the repeated urging of EHI, to determine broadly whether any OEMs would be interested in paying for insurance replacement leads. (Pl.'s Ex. 1: Sarkissian Dep. at

70-72, 93) Mr. Sarkissian testified that he made these limited disclosures based on his close personal relationship with each recipient and their understanding of the concept's confidential nature. *Id*. at 92, 96-99. Mr. Sarkissian's confidence was well placed: EHI has produced no evidence that SM's mobile engagement concept was compromised as a result.

The fact that SM did not mark its presentations to EHI "Confidential" have any bearing on its secrecy efforts: the NDA does not require such a designation because ***the presentations were already confidential under the express terms of the NDA***.[6] (Pl.'s Ex. 29: von Zelowitz Dep. at 175) To the extent that EHI itself disclosed SM's mobile engagement concept to OEMs, it was also with a full understanding that it was confidential: Ms. Lombardo specifically informed her counterpart at Mazda in writing that the concept was "confidential" (Pl.'s Ex. 12: 7/8/2011 Perez Email) and EHI entered into a nondisclosure agreement with Rogers Townsend, the advertising agency it hired to take SM's place in early July 2011. (Pl.'s Ex. 14: Agreement) Of course, EHI's disclosures were also governed by the NDA's provisions requiring EHI to take "all precautions [EHI] employs with respect to its most confidential information and materials." (Def.'s Ex. 8: NDA at ¶2(a)) As for the disclosure of SM's mobile engagement concept in the Complaint, that cat was already out of the bag thanks to EHI's national press release, carried in *The Wall Street Journal* among other widely-read publications.

### 4. The Destination Website

EHI has also asserted that OnRamp does not use or disclose SM's confidential information because its use of a direct link from its renters to OEM websites is fundamentally different from SM's concept using a link to a specially-created destination website. (Def.'s Brief at 9, 16-17) If that was ever true, it is no longer the case: EHI renters who scan the OnRamp QR

---

[6] SM's PowerPoint presentations were all marked with a copyright symbol (©) intended to protect its images and graphics and "Patent Pending" to protect its mobile marketing business processes. Mr. Sarkissian believed that the copyright mark meant that "███████████████████████████." (Pl.'s Ex. 1: Sarkissian Dep. at 272)

codes are taken to the OnRamp site, created and hosted by EHI. That site contains a selection of buttons and "apps" that a renter can click to visit (among other locations) the OEM's website. (Pl.'s Ex. 28: OnRamp landing page)  *This is exactly the model that EHI admits was originally proposed by SM.*

But even if OnRamp did link directly to the OEM sites, this was also SM's idea: the mobile engagement concept as developed by SM and described by Mr. Sarkissian and SM's marketing expert was a buying service connecting renters to information about the car they are renting for the purpose of increasing sales of that car model. The concept does not depend on whether the QR Code links the renter directly to the OEM's site or to a destination site first. SM would be entitled to compensation either way. (Pl.'s Ex. 1: Sarkissian Dep. at 146-148, 150)

Moreover, contemporaneous email messages and deposition testimony establishes that Mr. Sarkissian and Mr. Privitelli were always willing to structure the mobile engagement concept to permit renters to go directly to OEM websites, and that EHI agreed to compensate SM either way. *See* p. 6, *supra*; *see also* Pl.'s Ex. 1: Sarkissian Dep. 78, 85, 126-128, 360-367, 389-390.  This only makes common sense: Mr. von Zelowitz states unequivocally that "████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████." (Pl.'s Ex. 30: Report at 9) In any event, Mr. Morrell has admitted that EHI never presented SM's idea for a newly-created destination site to any of the OEMs. (Pl.'s Ex. 4: Morrell Dep. at 186, 220)

> **D.** **There Are Genuine Issues of Material Fact Regarding**
> **EHI's Misappropriation of SM's Mobile Engagement Concept**

At best, EHI's arguments serve as a useful summary of the many genuine issues of material fact in this action.  The voluminous record of conflicting testimony simply cannot

support a finding that EHI is entitled to judgment on any issue *as a matter of law*: there is too much documentary and testimonial evidence that SM's mobile engagement/buying service concept was a novel, original idea that EHI chose to rebrand and pass off as its own innovation. EHI's production of extensive, post-discovery declarations of executives who have already been deposed (one of whom was deposed twice) merely serves to confirm that disputes regarding key facts remain outstanding. *See* footnote 3, *supra*.

## II.  EHI MISAPPROPRIATED PLAINTIFFS' TRADE SECRET

SM and EHI agree that SM's claim for misappropriation of trade secrets is governed by the Missouri Uniform Trade Secrets Act (MUTSA). (Def.'s Br. at 17, n.7 and 18) Under MUTSA, a trade secret is:

> information, including…[a] formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Mo. Rev. Stat. § 417.450 *et seq.*

SM's mobile engagement concept satisfies this definition on its face.[7]

It has already been established that EHI hijacked SM's mobile engagement concept for the Mazda pilot program and OnRamp. Mr. von Zelowitz has testified that this constitutes use and disclosure of SM's trade secret. (Pl.'s Ex. 29: von Zelowitz Dep. at 192) EHI alleges that SM's mobile engagement concept is not a trade secret because it was already known to EHI when Mr. Sarkissian presented it, it was not "novel," SM allegedly failed to take substantial measures to protect the concept's secrecy, and the concept has no economic value. These are substantially the same arguments EHI raised regarding SM's confidential information, and they

---

[7]  EHI does not argue that SM's Complaint fails to state a claim for misappropriation of trade secrets under MUTSA. Rather, EHI contends that its claim fails as a matter of law. (Def.'s Br. at 18) Nevertheless, if the Court determines that SM has not stated a claim under MUTSA, SM should be permitted to amend its Complaint.

fail for many of the same reasons already discussed.

The earlier discussion conclusively establishes that EHI was not aware of SM's mobile engagement concept before it was presented by SM. *See* pp. 13-15 *supra*. Nor is there any question that SM's mobile engagement concept is "novel." SM's mobile marketing expert has opined that the concept is "original, novel, and optimal" and an "original and novel program." (Pl.'s Ex. 30: von Zelowitz Report at 6-7, 12-13) This testimony stands unrebutted. And EHI itself declared that the concept was "industry-leading" when it announced the OnRamp program in November 2011, declaring that EHI "is the first car rental company to create a comprehensive QR code-based renter engagement campaign." (Pl.'s Ex. 23: 11/8/2011 Press Release) These statements constitute admissions that independently preclude summary judgment on this issue.

The record also establishes that SM took substantial measures to protect the secret nature of its mobile engagement concept, especially entering into the NDA with EHI. *See* pp. 2, 14-16 *supra*. EHI's position that it was not sufficient for SM to rely on the NDA is both legally untenable and a disturbing insight into EHI's dismissive view of the agreement.

Finally, SM has established that the mobile engagement concept has economic value, indeed *substantial* economic value. Its damages expert has produced a detailed report and extensive deposition testimony to that effect. EHI's own damages expert, hired to purportedly rebut the findings of SM's damages expert, admitted in his own deposition testimony that the concept has economic value. *See* pp. 21-24 *infra*.

### III.    EHI ENGAGED IN FRAUD AND/OR MISREPRESENTATION

EHI asserts first that SM cannot recast its breach of contract and MUTSA claims as a misrepresentation claim based on EHI's failure to honor the terms of the NDA or to negotiate in good faith with regard to the SRA. But EHI fails to understand that SM's misrepresentation

claim is premised on EHI's *entire course of dealing with SM* from at least May through November 2011, when it plotted to misappropriate SM's buying service concept, used it to launch a pilot program with Mazda, and occupied SM with the illusory SRA, all while EHI was actively developing SM's concept into OnRamp.



(Pl.'s Ex. 30: von Zelowitz Report at 13)

EHI engaged in a long con to misappropriate SM's mobile engagement concept while making misrepresentations designed to prevent SM from marketing it to EHI's competitors, a claim independent of breach of contract. Even the New York cases cited by EHI regarding breach of contract acknowledge that SM can assert "a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). The same is true with regard to SM's MUTSA claim: EHI's fraudulent misrepresentations are not simply part of the trade secret misappropriation: they are independent evidence of EHI's collateral scheme to prevent SM from marketing its concept to other rental car companies. Under these circumstances, EHI cannot cherry pick individual events or allegations and argue that, by themselves, they cannot support a misrepresentation claim, especially because EHI asserts that the NDA does not even protect SM's concept.

Incredibly, EHI attempts to evade liability for its deceptive scheme by asserting that it "had no legal duty to disclose its negotiations with Mazda or its future business plans." (Brief at 21) But when its plans involved affirmative statements and actions, and concealment designed to deceive SM, misrepresentation and silent fraud are plainly implicated regardless of whether an independent legal duty was owed. The *Bridgestone/Firestone* decision also makes it clear that

proof of a legal duty to disclose is not necessary if SM demonstrates misrepresentation collateral to the contract, as it has here. *Id*. at 20.

EHI also contends that it never concealed its preference to work directly with OEMs. But EHI never disclosed that it intended to do so by misappropriating SM's mobile engagement concept: SM always understood that it would be compensated for use of its concept. (Pl.'s Ex. 1: Sarkissian Dep. at 146-148, 150, 360, 389-390) It is EHI's duplicity in making deceptive statements and omissions in misappropriating SM's mobile engagement concept that creates an independent cause of action for fraud and misrepresentation, even if its claims for breach of contract and violation of MUTSA do not succeed.

## IV. PLAINTIFFS' HAVE STATED EQUITABLE CLAIMS FOR RELIEF

### A. Unjust Enrichment and Quantum Meruit

EHI argues that SM's claims for unjust enrichment and quantum meruit are pre-empted by MUTSA and cannot succeed in the face of the parties' NDA. SM agrees that both claims are in the alternative to SM's trade secret and breach of contract claims. This is particularly clear in light of EHI's assertion that the NDA does not protect the confidential information at issue in this action: SM's mobile engagement concept.

### B. Promissory Estoppel and Equitable Estoppel

EHI's arguments regarding promissory estoppel and equitable estoppel reflect a basic misunderstanding of what SM has alleged. While Plaintiffs understood that EHI never signed the Strategic Relationship Agreement, and that there would be no such Agreement absent the parties' mutual consent to its terms, EHI promised SM that it would review and consider the terms of the proposed SRA in good faith. SM understood that the SRA was under serious consideration right up until the day of the press release announcing OnRamp. (Pl.'s Ex. 1: Sarkissian Dep. at 161-

162; Pl.'s Ex. 3: Privitelli Dep. at 178) Even, Mr. Morrell believed that the SRA was never rejected by EHI. (Pl.'s Ex. 4: Morrell Dep. at 244-254, 261) With these fact issues outstanding, EHI cannot establish as a matter of law that it rejected the SRA or that its terms were so unacceptable that it could never serve as the basis for further negotiation between the parties. Although Mr. Sarkissian was an experienced businessman, he was *still* entitled to rely on EHI's representations that it was considering the SRA when in reality it was stringing SM along until it could publicly announce the OnRamp program.

## V. PLAINTIFFS HAVE ESTABLISHED SUBSTANTIAL DAMAGES

### A. The SM Concept Has Economic Value

EHI argues that OnRamp, a program which it has spent well over a year developing and implementing throughout its entire North American fleet of rental vehicles, a program it has publicly bragged is "industry leading," has no value. In addition to defying logic and common sense, this position is contradicted by the testimony of both damages experts. The report of Maurecio Kohn, SM's damages expert, establishes that SM is entitled to substantial damages[8] based on the value of SM's mobile engagement concept:



(Pl.'s Ex. 32: Report at 7; emphasis supplied)

Mr. Kohn employed three different models to determine the value of SM's mobile engagement concept and concluded that SM's damages range from $10.9 to $38.1 million. *Id.* at 8.

---

[8] Under Missouri law SM's entitlement to nominal damages for breach of contract is sufficient to defeat summary judgment. *Hanna v. Darr,* 154 S.W.3d 2, 5 n. 2 (Mo.App. E.D.2004) (it is a "fundamental precept of contract law that nominal damages are available where a contract and its breach are established."); *Glenn v. HealthLink HMO, Inc.,* 360 S.W.3d 866, 872 (Mo.App. E.D.2012) ("The existence of nominal damages is sufficient to preclude summary judgment" on a breach of contract claim.).

That the SM concept has value is also supported by the written report and deposition testimony *of EHI's own damages expert*, Paul Regan: "



." (Pl.'s Ex. 33: Regan Dep. at 220-221 (emphasis supplied). He also agreed that it is "a benefit to EHI" to facilitate sales of OEM vehicles by helping it to obtain more desirable cars for its fleet. *Id*. at 62-63; *see also* 153-155. Mr. Regan agreed that enhancing its relationship with the OEMs "████████████████████████████████████████████████████████████████████████████████████████████████." (*Id*. at 64, emphasis supplied; *see also* at 176)

Mr. Regan also noted that OnRamp will lead to increased customer satisfaction, more rentals for EHI and increased goodwill with its customers. *Id*. at 62-64, 66. He emphasized that EHI's "████████████████████████████████████████████████████." Mr. Regan further agreed that EHI's placement of banner advertisements for its own Car Sales division on the OnRamp website could very well lead to increased sales *Id*. at 67-69.

In addition, SM's marketing expert agrees that the mobile marketing concept has value and benefits for EHI and that EHI can earn profits from OnRamp whether or not it charges OEMs for leads (Pl.'s Ex. 30: von Zelowitz Dep. at 67-69, 72, 138-139) This is buttressed by written evidence that Mazda, is promoting OnRamp as a way to boost sales of its vehicles and indicating that OEMs would be willing to pay for leads. (Pl.'s Ex. 34: 11/16/2012 Mazda Memo)

The whole notion that EHI obtains no benefit from OnRamp and does not intend to profit in any way from the program is inconsistent with its request to SM at the very start that it wanted to "monetize" its insurance replacement business. (Pl.'s Ex. 1: Sarkissian Dep. at 20-21, 37, 40,

62; Pl.'s Ex. 29: von Zelowitz Dep. at 6, 61, 82, 92, 199-201[9]

### B. The Economic Value Can Be Measured With Reasonable Certainty

EHI also asserts that SM's damages are unduly speculative because SM's mobile engagement concept has never been implemented. Of course, SM's concept *has* been implemented: EHI has chosen to call it OnRamp. The value of OnRamp is thus the surest measure of SM's damages in this case.

In addition, the Kohn Report demonstrates that it is possible to place a firm value on SM's mobile engagement concept even though EHI has chosen not to charge OEMs for participation. "." (Pl.'s Ex. 32: Kohn Report at 14) Referring to the use of proxy models to determine the value of SM's mobile engagement concept, Mr. Kohn states in his Report that

" *Id*. at 14; *see also* Pl.'s Ex. 35: Kohn Dep. at 167. This is not unduly speculative and is entirely consistent with Missouri law on damages:

> In some cases, the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits. *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 54-55 (Mo. 2005) (internal citations omitted).

Moreover, Missouri law specifically provides that uncertainty regarding measurement of

---

[9] It is worth noting that EHI's consistent refusal to produce any information regarding the financial benefits of OnRamp is precisely what has required SM's damages expert to employ a proxy approach to develop models that will determine the value of the program. (Pl.'s Ex. 35: Kohn Dep. at 181)

lost profits does not prevent a recovery of damages: "While an estimate of prospective or anticipated profits must rest upon more than mere speculation, *'[u]ncertainty as to the amount of profits that would have been made does not prevent a recovery.*' *Gasser v. John Knox Village,* 761 S.W.2d 728, 734 (Mo.App.1988). The claimant must establish the fact of damages with reasonable certainty, but it is not always possible to establish the amount of damages with the same degree of certainty." *Ameristar, supra* (emphasis supplied).

This is supported by the testimony of Mr. Regan, EHI's own damages expert, who testified that lack of revenue from a program does not mean that its value cannot be calculated with sufficient certainty for use in a lawsuit: (Pl.'s Ex. 33: Regan Dep. at 217)[10] All of this establishes that there are genuine issues of material fact as to SM's damages.

## C. Other Damages

EHI's arguments with regard to damages for unjust enrichment are similarly hollow. EHI's tired assertion that it had the idea for SM's mobile engagement concept before it was proposed by SM has already been defeated. *See* p. 12-16 *supra*. Moreover, EHI's remarkable statement that "it is undisputed that EHI obtains no financial benefits from the installation of QR codes" in its vehicles *has been directly contradicted by the Report and sworn testimony of both parties' damages experts. See* pp. 22-24 *supra*.

EHI asserts that SM's costs incurred in developing and presenting SM's mobile engagement concept to EHI, are unrecoverable "expenses of a failed negotiation". But SM is not attempting to recover *negotiating* costs, but instead its costs in *developing and presenting* its mobile engagement concept. These costs are recoverable under theories of promissory estoppel, quantum meruit, and misrepresentation. EHI's assertions that SM's time is "bloated" and

---

[10] Mr. Regan has also admitted that the standards he used to critique the allegedly speculative nature of the Kohn Report are *not authoritative* in his field, not peer reviewed, and that using methodologies different from those he relies upon is not "necessarily wrong." (Pl.'s Ex. 33: Regan Dep. at 107)

"phony" are directly contradicted by the testimony of its own damages expert, who agreed that despite innuendo from EHI, SM's time logs are not dishonest or fraudulent. (Pl.'s Ex. 33: Regan Dep. at 206, 209)

## CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, Plaintiffs request that this Court deny Defendant's Motion for Summary Adjudication of Issues and Summary Judgment in its entirety.


Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

_____/s/ Kevin F. O'Shea_____
Kevin F. O'Shea
Melissa Wojnar-Raycraft
950 West University Drive Ste. 300
Rochester, MI 48073
Dated: March 22, 2013                  248-841-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2013, I filed the foregoing document using the electronic filing system which will serve all parties of record.

Respectfully submitted,
*/s/ Kevin F. O'Shea*
Kevin F. O'Shea
The Miller Law Firm, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
kfo@millerlawpc.com
248-841-2200
248-652-2852 facsimile