**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARKISSIAN MASON, INC., a Michigan
corporation, and AUTOMATIC, LLC, a Delaware
Limited Liability Company,

                Plaintiffs,

        v.

ENTERPRISE HOLDINGS, INC., a Missouri
corporation,

                Defendant.

Case No. 11 CV 9472 (LGS)
Hon. Lorna G. Schofield

Kevin F. O'Shea (*pro hac vice*)
Melissa Wojnar-Raycraft (*pro hac vice*)
Sharon S. Almonrode (SA1445)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: 248-841-2200
Facsimile: 248-652-2852

*Attorneys for Plaintiffs*

Douglas W. Sullivan (*pro hac vice*)
M. Kay Martin (*pro hac vice*)
Joel D. Smith (*pro hac vice*)
CROWELL & MORING LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

Daniel D. Edelman
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4134

*Attorneys for Defendant*

**JOINT STATUS LETTER**

1.    **Nature of the Case**

    **Plaintiffs' Statement:**

    Plaintiffs, Sarkissian Mason, Inc. and its subsidiary, Automatic LLC (collectively "SM"), comprise a highly successful mobile marketing advertising agency. Defendant, Enterprise Holdings, Inc. ("EHI") is the largest rental car company in the world.  Plaintiffs' case involves claims for breach of contract, misappropriation of trade secrets, and other related claims.  In October 2010, SM and EHI entered into a Non-Disclosure Agreement ("NDA"), which the Plaintiffs allege covers the subject matter of this case.  Plaintiffs allege that at EHI's request, in

early 2011, SM developed an entirely new concept to take advantage of EHI's dominance of the insurance replacement market: a buying service using "mobile engagement" technology to connect renters and vehicle manufacturers (called "OEMs") for the purpose of generating new car sales for OEMs. SM proposed placing computer codes (Quick Response Codes or "QR Codes") in EHI's vehicles that renters could scan using their smartphones. The scans would lead renters to engaging content specifically designed to persuade them to purchase the same model as the cars they were driving.

Plaintiffs allege that EHI breached the NDA and misappropriated Plaintiffs' trade secrets by: (1) disclosing Plaintiffs' concept to EHI's customer, Mazda, Volkswagen, BMW, Toyota, Fiat, Ford, Nissan, and other OEMs without Plaintiffs' knowledge and (2) rebranding SM's mobile engagement concept and launching it under the name OnRamp in November 2011.

**Defendant's Statement:**

Between March and June 2011, Plaintiffs made pitches to EHI in the form of PowerPoint presentations, which largely consisted of a series of pictures purporting to depict EHI's rental car business. In these presentations, Plaintiff Automatic proposed developing its own Automatic website (at a cost to it of $1.25 million), which would advertise the vehicles being driven by the customers. Automatic's hope was that the car manufacturers of the vehicles would agree to pay Automatic for sales leads resulting from rental car customers visiting the Automatic website.

EHI, however, chose not to contract or do business with Plaintiffs, concluding that the car manufacturers were more likely to want to use their own websites to advertise their own cars, rather than an Automatic website. Nevertheless, EHI advised Plaintiffs that if a car manufacturer was prepared to contract with Automatic to use an Automatic website and pay Automatic for sales leads that might be generated, EHI would consider a "pilot" program with Automatic and a willing car manufacturer. Automatic, however, was unable to get any car manufacturer to agree. Plaintiffs never created a website or spent the $1.25 million to create the Automatic website.

EHI has filed a Motion for Summary Adjudication of Issues and Summary Judgment (briefing completed on April 1, 2013). EHI generally contends that the undisputed material facts establish that Plaintiffs' presentations contained no confidential information, that EHI did not misappropriate any allegedly confidential information or trade secrets, and that Plaintiffs have suffered no damages, having never built their proposed website.

2

2.    **Subject Matter Jurisdiction**

The parties agree that subject matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Enterprise, and the alleged amount in controversy exceeds $75,000 exclusive of interest and costs.  Sarkissian Mason, Inc. is a Michigan corporation with its principal place of business in New York City, New York.  Automatic LLC is a Delaware Limited Liability Company with its principal place of business in New York City, New York.  EHI is a Missouri corporation with its principal place of business in St. Louis, Missouri.

3.    **Motion Practice**

By letter of April 4, 2013, Plaintiffs have requested the Court to grant them the opportunity to respond to objections that EHI raised to documents and testimony submitted by Plaintiffs in opposition to the Motion for Summary Adjudication of Issues and Summary Judgment.  Otherwise, the briefing on EHI's Motion for Summary Adjudication of Issues and Summary Judgment was completed on April 1, 2013, and EHI has requested oral argument. There are no other previous, anticipated or pending motions.

4.    **Discovery**

Discovery in this case is closed, and the discovery deadlines set by Judge Crotty have passed.  Plaintiffs contend that due to the current implementation and the continuing evolution of EHI's OnRamp program, Defendant is obligated to continue to supplement its discovery responses pursuant to Rule 26(e).  EHI has made eight supplemental productions from April 2012 through January 2013, and is evaluating Plaintiffs' latest request for supplementation, dated March 28, 2013, to determine what, if anything needs to be supplemented.

Plaintiffs contend that all deposition testimony and deposition exhibits, expert reports, as well as additional documents produced during discovery, material to proof of claims and defenses, are likely to be admissible at trial under the Federal Rules of Evidence.

EHI's position is that given the pending motion for summary adjudication/judgment, the parties have not identified exhibits or deposition testimony for use at trial; hence, EHI cannot identify at this stage what exhibits and testimony are objectionable.

SFACTIVE-903008301.1

5.    **Damages**

Plaintiffs' Damages Expert employed three different models to determine the value of Plaintiffs' mobile engagement concept and concluded that Plaintiffs' damages range from $10.9 to $38.1 million.

As set forth in EHI's motion for summary adjudication/judgment, EHI contends that the undisputed facts establish that Plaintiffs have no cognizable damages.

6.    **Procedural Posture and Deadlines**

No hearing on EHI's motion for summary adjudication/judgment has been scheduled. There is no status conference currently scheduled. The last status conference with The Honorable Paul A. Crotty was held on August 30, 2012. At that conference, Judge Crotty set the new discovery cut off, granted EHI authorization to file a summary judgment motion and referred the case for a settlement conference. Pursuant to Rule IV.B.1 of the Court's Individual Rules and Procedures, the Joint Pretrial Order is to be submitted within 30 days after entry of the Court's ruling on EHI's motion for summary adjudication/judgment unless otherwise ordered by the Court. The parties' best estimate of the length of trial is eight days.

7.    **Settlement Discussions**

Pursuant to Judge Crotty's September 6, 2012, order of reference, Magistrate Judge Debra C. Freeman held a telephonic settlement conference on September 14, 2012. Pursuant to her instruction, Plaintiffs served a written settlement demand and EHI provided a written response. A Settlement Conference call was held on October 2, 2012. Plaintiffs contend that Magistrate Judge Freeman determined that the parties' positions were too far apart to warrant further settlement efforts at that time and the Magistrate advised that the parties should have another conference after a ruling on EHI's motion for summary adjudication /judgment. EHI contends that Magistrate Freeman indicated that there was no point in further settlement discussions and did not convene an in-person conference, but suggested that she would be willing to consider further discussions if both parties believed that it made sense.

SFACTIVE-903008301.1

*Respectfully Submitted,*

**THE MILLER LAW FIRM, P.C.**

Kevin F. O'Shea (mwk)

Kevin F. O'Shea
*Attorneys for Plaintiffs*

**CROWELL & MORING LLP**

Douglas W. Sullivan
*Attorneys for Defendant*

Dated: April 8, 2013

5

SFACTIVE-903008301.1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

*JUDGE CROTTY*

SARKISSIAN MASON, INC.
a Michigan corporation, and
AUTOMATIC LLC, a Delaware
Limited Liability Company,

*11 CIV 9472*

CASE NO.
HON.

Plaintiffs,

**JURY TRIAL DEMANDED**

vs.

ENTERPRISE HOLDINGS, INC.
a Missouri corporation,

*RECEIVED*
*DEC 2 2 2011*
*U.S.D.C. S.D. N.Y.*
*CASHIERS*

Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiffs Sarkissian Mason, Inc., and Automatic LLC, by and through their attorneys, The Miller Law Firm, P.C., state as follows for their Complaint and Jury Demand against Defendant Enterprise Holdings, Inc.:

### PARTIES

1.      Plaintiff Sarkissian Mason, Inc. ("Sarkissian Mason") is a Michigan corporation with its principal place of business in New York City, New York.

2.      Plaintiff Automatic LLC ("Automatic") is a Delaware Limited Liability Company with its principal place of business in New York City, New York.

3.      Defendant, Enterprise Holdings, Inc. ("Enterprise") is a Missouri corporation that does business throughout the United States, including in this District. Enterprise has its principal place of business in St. Louis, Missouri.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because

there is complete diversity of citizenship between Plaintiffs and Defendant and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Venue is proper in this District in accordance with 28 U.S.C. § 1391 (a)(1) and (c) because Plaintiffs do business in this District and have their principal places of business in this District, and Defendant is subject to personal jurisdiction in this District because it does business through a number of wholly-owned branches of its corporate subsidiaries located in this District.

## GENERAL ALLEGATIONS

6.      Sarkissian Mason is a privately-owned, full service, independent media agency specializing in the creation and development of breakthrough digital brand programs for its clients. Sarkissian Mason has been a pioneer in helping its clients adapt new technology programs to better connect with consumers.

7.      Automatic is a subsidiary owned and controlled by Sarkissian Mason that, among other things, develops and operates targeted test drive programs designed to increase vehicle sales for its client automobile manufacturers and dealers.

8.      Enterprise is a privately-owned company formed to operate several car rental subsidiaries, including the Alamo, Enterprise, and National car rental chains. With 6,000 rental locations, more than one million vehicles, and approximately 70,000 employees, Enterprise is the largest car rental service provider in the United States.

9.      In or about September 2010, Enterprise approached Plaintiffs to develop a program for fulfillment and delivery of Lincoln vehicles to the homes of potential Lincoln customers for test drives.

10.     On October 1, 2010, Sarkissian Mason and Enterprise entered into and executed a Nondisclosure Agreement under which they agreed that certain information regarding Sarkissian

Mason's business would remain confidential. The Nondisclosure Agreement was designed to broadly protect Sarkissian Mason's valuable proprietary information, processes, and ideas while the parties conducted business and explored new business ventures.

11.     Under the Nondisclosure Agreement, "Confidential Information" is defined to include "Confidential Information of [either party's] parent company, and any of its affiliates and wholly-owned subsidiaries (all of which, for purposes of this Agreement, shall be considered a 'Disclosing Party')." (Exhibit A: Nondisclosure Agreement at Recital B)

12.     Under the Nondisclosure Agreement, Enterprise agreed "forever (a) to hold all of the Confidential Information of [Sarkissian Mason and its affiliates and wholly-owned subsidiaries] in strict confidence…(b) not to disclose any of the Confidential Information of [Sarkissian Mason] or any information derived therefrom to any third person, (c) not to make use whatsoever at any time of any of the Confidential Information of the Disclosing Party except to evaluate internally whether to enter into the currently contemplated business relationship with [Sarkissian Mason], and (d) not to copy or disassemble, or otherwise reverse engineer any Confidential Information of [Sarkissian Mason]." (Exhibit A: Nondisclosure Agreement at Paragraph 2)

13.     In or about March 2011, Enterprise asked for Plaintiffs' help in realizing additional profits from its role in the automobile insurance replacement market.

14.     Plaintiffs responded by developing and presenting a new, proprietary program to allow Enterprise customers to use Smart Phone technology to obtain information about the vehicles they were renting. Sarkissian Mason acted on its own behalf and on behalf of Automatic.

15.     The new program, called the "AutoMatic Buying Service," was designed to allow

car rental customers to use their Smart Phones to scan QR ("Quick Response") codes placed on vehicle key tags and dashboards to, among other things, learn more about their rental vehicles and locate a local dealer if they were interested in purchasing a similar car.

16.     The goal of the AutoMatic Buying Service was to use the positive driving experiences of Enterprise customers to increase sales by the automobile manufacturers who supplied vehicles to Enterprise and who chose to participate in this additional service.

17.     In addition, Plaintiffs created, including but not limited to, the business model, the customer interface, the web pages, and the presentations for the AutoMatic Buying Service. They compiled the research on, including but not limited to, the QR codes, the Smart Phone adoption, and the automotive industry's online market and projected, including but not limited to, the program development timing, the build-out costs, and the revenue forecasts.

18.     Pursuant to the Nondisclosure Agreement, Plaintiffs shared with Enterprise, including but not limited to, their business plans, ideas, product development plans, and strategies and information, including but not limited to, Plaintiffs' comprehensive PowerPoint presentations regarding all aspects of the AutoMatic Buying Service.

19.     During June and July 2011, Plaintiffs worked extensively to educate Enterprise regarding their business plans, strategies, and ideas via repeated communications and sharing of information.

20.     On June 10, 2011, Plaintiffs made an extensive and highly proprietary and confidential PowerPoint presentation to Enterprise executives, providing a detailed blueprint of every step of the AutoMatic Buying Service, including the proposed development, marketing, and implementation of all parts of the program.

21.     In their June 10, 2011 presentation, Plaintiffs estimated the total development

time for the AutoMatic Buying Service would be "5-6 months."

22.     At Enterprise's request, in July 2011, Plaintiffs also provided Enterprise with detailed proprietary information regarding their extensive business contacts at MazdaUSA so that Enterprise could confirm the strong interest of automobile manufacturers in the AutoMatic Buying Service.

23.     On July 15, 2011, representatives of the parties met to discuss the terms of an agreement to implement the AutoMatic Buying Service. That day Plaintiffs provided a written list of suggested terms for such an agreement.

24.     On July 20, 2011, Jeffrey R. Morrell, Vice President of Business Development for Enterprise, informed Plaintiffs that the proposed terms accurately reflected the parties' discussion and that it would "work with the wording on several points" and return it to Plaintiffs for review.

25.     On August 4, 2011, Plaintiffs promised to forward a draft of the proposed agreement to Enterprise later in the month. On August 18, 2011, Plaintiffs sent Enterprise a draft Strategic Relationship Agreement for the AutoMatic Buying Service.

26.     Under the terms of the Strategic Relationship Agreement, Automatic was to, among other things, undertake development of the AutoMatic Buying Service and Enterprise was to, among other things, install the AutoMatic Buying Service in its fleet of rental vehicles.

27.     The parties continued to negotiate the terms of the Strategic Relationship Agreement during the remainder of August and September 2011. The parties exchanged additional drafts and Enterprise informed Plaintiffs that its legal department was reviewing the Strategic Relationship Agreement.

28.     In or about late September 2011, the parties participated in a conference call to

finalize the Strategic Relationship Agreement. After inquiries from Plaintiffs, in late October 2011, Mr. Morrell again provided assurances that Enterprise was committed to entering into the Strategic Relationship Agreement to implement the AutoMatic Buying Service.

29.     On November 7, 2011, Mr. Morrell instructed Plaintiffs that "[w]e're about done with our proposed agreement. I think everyone has signed off on it" and that obtaining final approval from Enterprise executives was "just a courteous formality."

30.     The very next day, without providing warning of any kind to Plaintiffs, Enterprise issued a press release publicly announcing the launch of a new program called OnRamp, making it possible for Enterprise customers to use their Smart Phones to scan QR codes on Mazda vehicles to learn more about purchasing the same or similar vehicles. (Exhibit B: Enterprise Press Release)

31.     The Enterprise press release stated that the "QR code program is [the] first of its kind in the industry", referred to it as "a new industry-leading program", and trumpeted that "Enterprise is the first car rental company to create a comprehensive QR code-based renter engagement campaign." An Enterprise representative stated that "[p]lacing QR codes in our rental fleet vehicles is an innovative way to connect with drivers during the millions of test drives taking place in Enterprise's rental vehicles monthly."

32.     A representative of MazdaUSA stated that "[t]he ability to engage directly with drivers while they are in the midst of their rental experience is extremely valuable."

33.     Enterprise simultaneously announced its business plan to "eventually add QR codes to nearly 1 million vehicles throughout North America."

34.     Enterprise's press release was carried by dozens of national publications, including *USA Today*, *The Wall Street Journal*, and a number of automobile industry

publications such as *Automotive News*.

35.     Based on Enterprise's own description, the OnRamp program is substantially the same as the AutoMatic Buying Service Plaintiffs proposed to Enterprise: "Scanning the QR code with a smartphone launches a mobile-optimized site where car rental customers can learn more about the vehicles they are renting, find a local dealer if they are interested in purchasing a similar car to the one they are driving, and more. The QR codes are placed on key tags as well as on the driver side window of all vehicles...."

36.     Enterprise's announcement of the launch of the OnRamp program came approximately five months after Plaintiffs had provided Enterprise with their detailed blueprint of the AutoMatic Buying Service, in which Plaintiffs estimated a development time for the program of five to six months.

37.     Upon information and belief, Enterprise used the proprietary and confidential information supplied by Plaintiffs to develop the AutoMatic Buying Service with the intention of marketing it directly to automobile manufacturers without Plaintiffs' involvement.

38.     Upon information and belief, Enterprise used the proprietary and confidential contact information supplied by Plaintiffs to market the AutoMatic Buying Service to MazdaUSA (renamed "OnRamp") at the same time Enterprise purported to participate in good faith negotiations regarding the terms of the Strategic Relationship Agreement with Plaintiffs.

39.     Upon information and belief, Enterprise deliberately concealed its dealings with MazdaUSA from Plaintiffs in order to misappropriate the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas for its own sole gain.

40.     On November 9, 2011, in an attempt to salvage their business relationship with Enterprise, Plaintiffs congratulated Enterprise on its announcement of the launch of the

AutoMatic Buying Service and expressed their eagerness to proceed with the Strategic Relationship Agreement.

41.     The next day, Mr. Morrell again assured Plaintiffs that Enterprise intended to execute the Strategic Relationship Agreement: "I apologize for how slow we're moving. Getting to everyone we need to sign off is not easy. We'll get there."

42.     On November 15, 2011, without advance notice of any kind, Enterprise proposed a new arrangement in which Enterprise would operate a pilot program of the AutoMatic Buying Service in Chrysler vehicles only. Enterprise did not mention the OnRamp program or the public announcement of its launch.

43.     Enterprise has refused to acknowledge its misappropriation of the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas or to respond to Plaintiffs' request for a complete explanation of Enterprise's actions regarding the AutoMatic Buying Service.

## COUNT I: BREACH OF CONTRACT

44.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

45.     Under the Nondisclosure Agreement, Enterprise agreed to forever hold all of Sarkissian Mason's confidential information in strict confidence and to take reasonable precautions to protect such information, including not disclosing any of the Confidential Information to any third person, not making use of the Confidential Information except to evaluate internally whether to enter into a business relationship with Sarkissian Mason, and not to copy or otherwise reverse engineer any of the Confidential Information

46.     Enterprise has breached the Nondisclosure Agreement as follows:

a. Enterprise disclosed the Confidential Information of Sarkissian Mason to one or more third persons, including but not limited to employees of MazdaUSA;

b. Enterprise made use of the Confidential Information of Sarkissian Mason for a purpose or purposes other than internally evaluating whether to enter into a business relationship with Sarkissian Mason, including but not limited to the development and/or implementation of the OnRamp program; and

c. Enterprise copied or otherwise reverse engineered the AutoMatic Buying Service in order to develop and/or implement the OnRamp program.

47.     Enterprise's actions constitute a material breach of the Nondisclosure Agreement.

48.     As a direct and proximate result of Enterprise's breach of contract, Plaintiffs have suffered substantial damages, including but not limited to the loss of development costs and expected revenue from implementation of the AutoMatic Buying Service.

**WHEREFORE**, Plaintiffs request that the Court grant judgment in their favor and against Enterprise in an amount of at least $75,000.00 plus exemplary damages, interest, costs, and attorneys fees wrongfully incurred.

## COUNT II:  PROMISSORY ESTOPPEL/EQUITABLE ESTOPPEL

49.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

50.     Enterprise made promises, representations, omissions, and/or engaged in a course of conduct with regard to Plaintiffs, all of which are set forth in this Complaint, including, but are not limited to the following:

a. That Enterprise would honor the terms of the Nondisclosure Agreement;

b. That Enterprise would negotiate in good faith regarding a possible business relationship with Plaintiffs; and

c. That Enterprise would enter into an agreement with Plaintiffs to

implement the AutoMatic Buying Service.

51.     These promises, representations, omissions, and/or course of conduct on the part of Enterprise should have been reasonably expected to induce action of a definite and substantial character on the part of Plaintiffs.

52.     At all relevant times Enterprise was fully aware of Plaintiffs' creation of the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas.

53.     At all relevant times prior to its abrupt decision to misappropriate the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas for its own sole gain, Enterprise engaged in a course of conduct consistent with the foregoing promises and agreements regarding Plaintiffs' compensation.

54.     Enterprise's promises, representations, omissions, and/or course of conduct did in fact produce reliance and forbearance on the part of Plaintiffs and they engaged in substantial business operations and expended significant time, effort, and expense to develop the AutoMatic Buying Service and to educate Enterprise regarding its implementation.

55.     As a direct and proximate result of Enterprise's promises, representations, omissions, and/or course of conduct, Plaintiffs have suffered substantial economic damages, including but not limited to the loss of development costs and expected revenue from implementation of the AutoMatic Buying Service.

**WHEREFORE**, Plaintiffs request that the Court grant judgment in their favor and against Enterprise in an amount of at least $75,000.00 plus exemplary damages, interest, costs, and attorneys fees wrongfully incurred.

## COUNT III:  UNJUST ENRICHMENT/QUANTUM MERUIT

56.     Plaintiffs incorporate by reference the allegations set forth in the preceding

paragraphs.

57.     Enterprise has received the value of Plaintiffs' services, property, and efforts, including but not limited to their expertise, business model, business plans, research, forecasts, timelines, ideas, product development plans, customer interface, web pages, presentations, business contacts, and strategies and information, including Plaintiffs' comprehensive PowerPoint presentations for Enterprise's internal meetings regarding the AutoMatic Buying Service.

58.     Plaintiffs worked extensively to educate Enterprise regarding their business plans, strategies, and ideas via meetings and presentations to Enterprise throughout 2011, including a detailed PowerPoint presentation on June 10, 2011.

59.     Enterprise misappropriated the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas for its own sole gain, renaming it OnRamp and implementing it with MazdaUSA.

60.     An inequity will result to Plaintiffs if Enterprise is permitted to retain the benefit provided by Plaintiffs without compensating Plaintiffs.

61.     Plaintiffs are entitled to receive the reasonable value of their services, property, and efforts rendered to Enterprise which Enterprise accepted and received.

62.     There exists an implied contract by Enterprise to fairly and reasonably compensate Plaintiffs for their services, property, and efforts.

63.     Enterprise has breached the implied contract to fairly and reasonably compensate Plaintiffs for their services, property, and efforts.

64.     As a direct and proximate result of Enterprise's wrongful actions, Plaintiffs have suffered substantial economic damages, including but not limited to the loss of development

costs and expected revenue from implementation of the AutoMatic Buying Service.

**WHEREFORE**, Plaintiffs request that the Court grant judgment in their favor and against Enterprise in an amount of at least $75,000 plus exemplary damages, interest, costs, and attorneys fees wrongfully incurred.

## COUNT IV:  MISREPRESENTATION AND/OR SILENT FRAUD

65.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

66.     Enterprise intentionally and/or negligently made false statements and/or material misrepresentations to Plaintiffs, including but not limited to the following:

    a.     That Enterprise would honor the terms of the Nondisclosure Agreement;

    b.     That Enterprise would negotiate in good faith regarding a possible business relationship with Plaintiffs; and

    c.     That Enterprise would sign an agreement with Plaintiffs to implement the AutoMatic Buying Service.

67.     Enterprise made omissions of material facts to Plaintiffs by failing to disclose its intention to misappropriate the AutoMatic Buying Service and Plaintiffs' business plans, strategies, and ideas for its own sole gain, failing to disclose that it did not intend to enter into an agreement with Plaintiffs, failing to disclose that it was taking active steps to negotiate with MazdaUSA for a launch the AutoMatic Buying Service (renamed OnRamp), and failing to disclose its business plan to expand the AutoMatic Buying Service (renamed OnRamp) to its entire North American fleet of over one million vehicles.

68.     Enterprise made these false and misleading statements and/or material misrepresentations and/or omissions of material facts to Plaintiffs and/or omissions with the intent to induce reliance on the part of Plaintiffs.

69.     Enterprise either knew that the above false and misleading statements and/or material misrepresentations and/or omissions of material facts were false when made or made them in reckless disregard of their truth, knowing that Plaintiffs would rely on them.

70.     Plaintiffs believed that Enterprise would honor the Nondisclosure Agreement and that the parties had reached an agreement to proceed with the AutoMatic Buying Service and did not know of any intentional and/or negligent false statements and/or material misrepresentations and/or omissions of material facts.

71.     At all relevant times Enterprise was fully aware of Plaintiffs' substantial investment in the AutoMatic Buying Service and their reliance on Enterprise's promises to honor the Nondisclosure Agreement, Enterprise's good faith negotiation of the Strategic Relationship Agreement, and Enterprise's repeated assurances that it would enter into an agreement with Plaintiffs to implement the AutoMatic Buying Service.

72.     Plaintiffs acted in reliance on Enterprise's intentional and/or negligent false and misleading statements and/or material misrepresentations and/or omissions of material facts.

73.     Enterprise has benefited from its intentional and/or negligent false and misleading statements and/or material misrepresentations and/or omissions of material facts.

74.     Plaintiffs expended substantial effort and expense in reliance upon Enterprise's intentional and/or negligent false and misleading statements and/or material misrepresentations and/or omissions of material facts.

75.     As a direct and proximate result of Enterprise's intentional and/or negligent false and misleading statements and/or material misrepresentations and/or omissions, Plaintiffs have suffered substantial economic damages, including but not limited to, the loss of development costs and expected revenue from implementation of the AutoMatic Buying Service.

**WHEREFORE**, Plaintiffs request that the Court grant judgment in their favor and against Enterprise in an amount of at least $75,000.00 plus exemplary damages, interest, costs, and attorneys fees wrongfully incurred, including punitive damages and/or injunctive relief.

## COUNT V:  MISAPPROPRIATION OF TRADE SECRETS

76.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

77.     The AutoMatic Buying Service, including one or more of its component elements, constitutes a trade secret or trade secrets of Plaintiffs.

78.     Enterprise learned of the AutoMatic Buying Service through its business relationship with Plaintiffs.

79.     Enterprise did not have the actual or implied consent of Plaintiffs to disclose the AutoMatic Buying Service to a third party or third parties. On the contrary, the AutoMatic Buying Service was protected from disclosure by the parties' Nondisclosure Agreement.

80.     Enterprise willfully and/or maliciously misappropriated one or more of Plaintiffs' trade secrets by improper means by, among other things:

     a.    Disclosing the AutoMatic Buying Service to third parties, including but not limited to employees of MazdaUSA;

     b.    Publicly disclosing the AutoMatic Buying Service (renamed OnRamp) by issuing a national press release on November 8, 2011;

     c.    Operating the AutoMatic Buying Service (renamed OnRamp) in vehicles that are part of Enterprise's rental fleet, including Mazda vehicles; and

     d.    Copying or otherwise reverse engineering the AutoMatic Buying Service in order to develop and/or implement its OnRamp program.

81.     As a direct and proximate result of Enterprise's misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered substantial economic damages, including but not limited to

14

the loss of development costs and expected revenue from implementation of the AutoMatic Buying Service.

82.     To the extent Enterprise denies that Plaintiffs are entitled to economic damages, Plaintiffs are entitled to injunctive relief including, but not limited to, a preliminary injunction and a permanent injunction.

**WHEREFORE**, Plaintiffs request that the Court grant judgment in their favor and against Enterprise in an amount of at least $75,000.00 plus exemplary damages, interest, costs, and attorneys fees wrongfully incurred, including punitive damages and/or injunctive relief.

<u>**JURY DEMAND**</u>

Plaintiffs demand a trial by jury as to all matters, issues, or claims so triable in this case.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

Courtney B. Ciullo (CC1282)
Marc L. Newman (pro hac vice pending)
Kevin F. O'Shea (pro hac vice pending)
The Miller Law Firm, P.C.
950 West University Dr., Suite 300
Rochester, MI 48307
(248) 841-2200
(248) 652-2852 facsimile

Dated: December 21, 2011

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SARKISSIAN MASON, INC.
a Michigan corporation, and
AUTOMATIC LLC, a Delaware                    CASE NO.
Limited Liability Company,                   HON.

     Plaintiffs,

vs.

ENTERPRISE HOLDINGS, INC.
a Missouri corporation,

     Defendant.

_____/

## INDEX OF EXHIBITS

| Exhibit # | Description |
|-----------|-------------|
| A. | Nondisclosure Agreement |
| B. | Enterprise Press Release, 11/8/2011 |

# EXHIBIT A

## NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement ("Agreement") is made and entered into as of the last date of execution set forth below (the "Effective Date"), by and between Enterprise Holdings Inc. with an address of 600 Corporate Park Drive, Saint Louis, Missouri 63105, and ("EHI"), and Sarkissian Mason, Inc., with an address of 135 W. 26th St., Floor 5, New York, NY 10001, ("Sarkissian").

## RECITALS

A.          EHI and Sarkissian have entered into a business relationship.

B.          In the course of such business relationship, either party may disclose certain Confidential Information (hereinafter referred as the "Disclosing Party") to the other party (hereinafter referred as the "Receiving Party"). The Disclosing Party desires that such disclosures be made on, and subject to, the terms and conditions of this Agreement, including any disclosure by the Disclosing Party that may include Confidential Information of its parent company, and any of its affiliates and wholly-owned subsidiaries (all of which, for the purposes of this Agreement, shall be considered a "Disclosing Party").

## TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the mutual covenants and agreements enumerated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1.          The Receiving Party understands that the Disclosing Party may disclose certain confidential information (whether in oral, written or digital form) to the Receiving Party (such information shall be collectively referred to as "Confidential Information") including, without limitation, information about the disclosing party's executives, employees, parent, subsidiaries, its subsidiaries' subsidiaries, affiliates, members, customers, suppliers, pricing, personal financial information, legal information, business information, including business plans, contracts and contractual relationships, customer names and related information, intellectual property, including technical drawings, know-how, formulas, processes, ideas, inventions (whether patentable or not), products, product development plans, services, forecasts, strategies and information. Notwithstanding the foregoing or anything else contained in this Agreement to the contrary, information will not be considered Confidential Information if it (a) is or becomes a part of the public domain through no direct or indirect act or omission of the Receiving Party, (b) was in the lawful possession of the Receiving Party prior to its disclosure to the Receiving Party by the Disclosing Party, (c) lawfully and properly is disclosed to the Receiving Party by a third party without restriction on disclosure, or (d) is developed independently by the Receiving Party.

2.          Subject to the terms and conditions of this Agreement, the Receiving Party hereby agrees forever (a) to hold all of the Confidential Information of the Disclosing Party in strict confidence and to take reasonable precautions to protect all of the Confidential Information of the Disclosing Party including, without limitation, taking all precautions the Receiving Party employs with respect to its most confidential information and materials, (b) not to disclose any of the Confidential Information of the Disclosing Party or any information derived therefrom to any third person, (c) not to make any use whatsoever at any time of any of the Confidential Information of the Disclosing Party except to evaluate internally whether to enter into the currently contemplated business relationship with the Disclosing Party,

and (d) not to copy or disassemble, or otherwise reverse engineer any Confidential Information of the Disclosing Party.

3.    The Receiving Party may make disclosures required by court order provided the Receiving Party promptly notifies Disclosing Party of the court order and participates in Disclosing Party's efforts to limit disclosure and obtain confidential treatment or a protective order.

4.    Immediately upon a request by the Disclosing Party at any time (which will be effective if actually received or three days after mailed first class postage prepaid to the Receiving Party's address herein), the Receiving Party will turn over to the Disclosing Party all Confidential Information of the Disclosing Party and all documents or media containing any Confidential Information of the Disclosing Party and any and all copies or extracts thereof.

5.    The Receiving Party understands that nothing herein (a) requires the disclosure of any Confidential Information of the Disclosing Party, which shall be disclosed, if at all, solely at the option of the Disclosing Party (in particular, but without limitation, any disclosure is subject to compliance with export control laws and regulations), or (b) requires the Disclosing Party to proceed with any proposed transaction or relationship in connection with which Confidential Information of the Disclosing Party may be disclosed.

6.    Neither the execution and delivery of this Agreement, nor the furnishing of any Confidential Information of the Disclosing Party by the Disclosing Party shall be construed as granting to the Receiving Party either expressly, by implication, estoppel or otherwise, any license under any invention, patent, trademark, or copyright now or hereafter owned or controlled by the Disclosing Party.

7.    This Agreement shall be governed by the laws of the State of Missouri without regard to the conflict of law provisions thereof.

**IN WITNESS WHEREOF,** the parties hereto have duly executed and have caused this Agreement duly to be executed and delivered as of the Effective Date.

Enterprise Holdings Inc.                               Sarkissian Mason, Inc.

By: _____                         By: _____

Printed Name: _Jat Month_                             Printed Name: _Marybeth Atzinger_

Effective Date: _10 - 1 - 10_                          Effective Date: _October 1, 2010_

# EXHIBIT B

## ENTERPRISE HOLDINGS LAUNCHES INDUSTRY-LEADING QR CODE PROGRAM STARTING WITH MAZDA6

*Enterprise to add QR codes to rental fleet of nearly 1 million vehicles; "OnRampSM" QR code program is first of its kind in the rental car industry*

**ST. LOUIS – Nov. 8, 2011 –** Enterprise Holdings – which owns and operates the Alamo Rent A Car, Enterprise Rent-A-Car and National Car Rental brands – is adding Quick Response (QR) codes to select Mazda6 vehicles throughout its North American fleet. The effort launches a new industry-leading program, "OnRamp℠," that will eventually add QR codes to nearly 1 million vehicles throughout North America.

Scanning the QR code with a smartphone launches a mobile-optimized site where car rental customers can learn more about the vehicles they are renting, find a local dealer if they are interested in purchasing a similar car to the one they are driving, and more. The QR codes are placed on key tags as well as on the driver side window of all vehicles, making vehicle information accessible to more than just the rental vehicle occupants.

Enterprise is the first car rental company to create a comprehensive QR code-based renter engagement campaign.

"Placing QR codes in our rental fleet vehicles is an innovative way to connect with drivers during the millions of test drives taking place in Enterprise's rental vehicles monthly," said Susan Lombardo, vice president of vehicle acquisition for Enterprise Holdings. "OnRamp exposes the thousands of renters who are likely looking for a new vehicle to a new experience that extends beyond the rental transaction and puts a spotlight on vehicles from our manufacturing partners like Mazda."

OnRamp kicks off this week with the special QR codes appearing in select Mazda6 vehicles throughout the Enterprise Rent-A-Car brand network of locations. With more than 5,500 car rental locations within 15 miles of 90 percent of the U.S. population and more than 450 locations across Canada, Enterprise Rent-A-Car is uniquely positioned to expose consumers in need of a rental – due to an accident or broken-down car – to a newer vehicle they might consider for purchase.

"Mazdas are for those who care about what they drive, how it drives, and the way it makes them feel," said Ron Stettner, vice president, U.S. Sales Operations, Mazda North American Operations. "This program gives consumers an opportunity to discover the unique driving experience you can only get from a Mazda.

"The ability to engage directly with drivers while they are in the midst of their rental experience is extremely valuable," continued Stettner. "The Enterprise OnRamp program gives current and potential new customers the opportunity to experience the Mazda6's dynamic styling, meticulous engineering, reassuring safety and advanced technology features."

ALG, Inc.(formerly Automotive Lease Guide), which provides consulting services for automotive manufacturers, finance companies and fleet companies, has historically suggested to manufacturers that they utilize the rental fleet channel in a thoughtful and responsible manner.

"Providing vehicles to rental fleets in the replacement market allows manufacturers the opportunity to gain consumer exposure to their newer products and features," said Eric Lyman, vice president, residual value solutions of ALG. "For models with low marketplace awareness, a positive rental experience can bolster brand perception and consideration."

On its busiest day in 2011, Enterprise Holdings had 1 million vehicles on rent – the equivalent of 1 million test drives. Owner and operator of the world's largest fleet of vehicles – Enterprise works in partnership with manufacturers to introduce new vehicles and new vehicle technologies to the driving public. Future campaigns will utilize vehicles available at all three Enterprise Holdings car rental brand locations.

### About Enterprise Holdings

Founded in 1957, Enterprise Holdings is the most comprehensive service provider and only investment-grade company in the U.S. car rental industry, operating the Alamo Rent A Car and National Car Rental brands, as well as its flagship Enterprise Rent-A-Car brand. Its worldwide network includes more than 7,800 neighborhood and airport locations, with 6,000 offices located within 15 miles of 90 percent of the U.S. population – and more than twice as many locations as Enterprise Holdings' nearest U.S. competitor. In addition, Alamo, Enterprise and National – which swept *Executive Travel* magazine's 2011 "Leading Edge Awards" for the top three car rental brands in the travel industry – collectively lead with more than one-third of all airport business in the United States and Canada. Further, for the last seven years in a row, Enterprise has led the industry in an annual North American airport car rental survey of leisure and business travelers.

For more information, contact:

Lisa Martini

314-512-2352

lisa.martini@ehi.com

With annual revenues of $14.1 billion and more than 70,000 employees, Enterprise Holdings operates, through its regional subsidiaries, more than 1 million cars and trucks, making it the largest car rental company in the world measured by revenue, employees and fleet. In addition, the company's annual revenues place it near the top of the travel industry, exceeding many airlines and most cruise lines, hotels, tour operators and online travel agencies. Owned by the Taylor family and headquartered in St. Louis, Enterprise Holdings' revenues for fiscal 2011 would place it 15th among the largest private companies in the United States. Enterprise Holdings and its affiliates offer business and retail customers a total transportation solution, which includes hourly rental, car leasing, WeCar car sharing and Enterprise Rideshare vanpooling programs, as well as the Enterprise Car Sales and Enterprise Commercial Truck rental business lines. In addition, Enterprise Holdings is part of a global strategic alliance with Europcar, creating the world's largest car rental network. For more information about Enterprise Holdings, visit *www.enterpriseholdings.com*. For more information about Enterprise Holdings' environmental stewardship and long-term commitment to the sustainability of its business, visit *www.DrivingFutures.com* and follow @LeeBroughton on Twitter.

### About Mazda

Mazda North American Operations is headquartered in Irvine, Calif. and oversees the sales, marketing, parts and customer service support of Mazda vehicles in the United States, Canada and Mexico through nearly 900 dealers. Operations in Canada are managed by Mazda Canada, Inc., located in Ontario; and in Mexico by Mazda Motor de Mexico in Mexico City.

For more information on Mazda vehicles, visit the online Mazda media center at www.mazdausamedia.com. Product B-roll may be ordered online by visiting The News Market at www.thenewsmarket.com/mazda.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SARKISSIAN MASON, INC., a Michigan
corporation, and AUTOMATIC, LLC, a Delaware
Limited Liability Company,

               Plaintiffs,

        v.

ENTERPRISE HOLDINGS, INC., a Missouri
corporation,

               Defendant.

---------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-15-12

11 CV 9472 (PAC)

**CIVIL CASE MANAGEMENT PLAN
AND SCHEDULING ORDER**

       This Civil Case Management Plan, submitted in accordance with Rule 26(f), Fed. R. Civ. P., is adopted as the Scheduling Order of this Court in accordance with Rule 16(f), Fed. R. Civ. P.

1.    All parties <u>do not consent</u> to conducting all further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c).

2.    The legal claims in this case are to be tried to <u>a jury</u>.

3.    Amended pleadings may not be filed and additional parties may not be joined except with leave of the Court. Any motion to amend or to join additional parties shall be filed within <u>30</u> days from the date of this Order.

4.    Initial disclosure pursuant to Rules 26(a)(1), Fed. R. Civ. P., shall be completed no later than <u>14</u> days from the date of this Order.

5.    All <u>fact</u> discovery shall be completed no later than <u>June 29, 2012</u>.

6.    The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. The following interim deadlines may be extended by the written consent of all parties without application to the Court, provided all fact discovery is completed by the date set forth in paragraph 5 above:

    a.    Initial requests for production of documents to be served by <u>March 1, 2012</u>.

    b.    Interrogatories to be served by <u>May 1, 2012</u>.

    c.    Depositions to be completed by <u>June 29, 2012</u>.

d. Requests to Admit to be served no later than <u>May 1, 2012</u>.

7. a. All <u>expert</u> discovery shall be completed no later than <u>August 15, 2012</u>.

b. No later than thirty (30) days <u>prior to</u> the date in paragraph 5, <u>i.e.</u> the completion of all fact discovery, the parties shall meet and confer on a schedule for expert disclosures, including reports, production of underlying documents and depositions, provided that (i) plaintiff(s)' expert report(s) shall be due before those of defendant(s)' expert(s); and (ii) all expert discovery shall be completed by the date set forth in paragraph 7(a).

8. All motions and applications shall be governed by the Court's Individual Practices, including pre- motion conference requirements.

9. All counsel must meet face-to-face for at least one hour to discuss settlement within fourteen (14) days following the close of fact discovery.

10. a. Counsel for the parties have discussed an informal exchange of information in aid of an early settlement of this case and have agreed upon the following:

> <u>The parties have agreed on an exchange of information by initial disclosures, followed by four early depositions</u>.

b. Counsel for the parties have discussed the use of the following alternate dispute resolution mechanisms for use in this case: (i) a settlement conference before a Magistrate Judge; (ii) participation in the District's Mediation Program; and/or (iii) retention of a privately retained mediator. Counsel for the parties propose the following alternate dispute resolution mechanism for this case: <u>Settlement conference before a Magistrate Judge</u>.

c. Counsel for the parties recommend that the alternate dispute resolution mechanism designated in paragraph b, be employed at the following point in the case (e.g. within the next sixty days; after the deposition of plaintiff is completed (specify date); after the close of fact discovery): <u>In May, following the initial round of depositions</u>.

d. The use of any alternative dispute resolution mechanism does not stay or modify any date in this Order.

11. The Final Pretrial Submission Date is thirty (30) days following the close of fact and expert discovery (whichever is later). By the Final Pretrial Submission Date, the parties shall submit a Joint Pretrial Order prepared in accordance with the undersigned's Individual Practices and Rule 26(a)(3), Fed. R. Civ. P. Any motions <u>in limine</u> (for which the premotion conference requirement is waived) shall be filed by the Final Pretrial Submission Date. If this action is to be tried before a jury, proposed voir dire, jury instructions and verdict form shall also be filed by the Final Pretrial Submission Date. Counsel are required to meet and confer on a joint submission of proposed jury instructions and verdict form, noting any points of disagreement in the submission. Jury instructions may not be submitted after the Final Pretrial Submission Date, unless they meet the standard of Rule

-3-

51(a)(2)(A), Fed. R. Civ. P. If this action is to be tried to the Court, proposed findings of fact and conclusions of law should be submitted by the Final Pretrial Submission Date.

12. Counsel for the parties have conferred and their present best estimate of the length of trial is: 8 days.

13. The "dates" column below shall be filled out by counsel:

| 13. Civil Case Management Plan Requirement | Dates: |
|---|---|
| Motion to amend or to join additional parties to be filed no later than: | 3/16/2012 |
| Initial Disclosure pursuant to Rule 26(a)(1), Fed.R.Civ.P. to be served no later than | 2/29/2012 |
| All fact discovery to be completed no later than: | 6/29/2012 |
| Discovery - initial requests for production of documents to be served no later than: | 3/1/2012 |
| Discovery - interrogatories to be served no later than: | 5/1/2012 |
| Discovery - depositions to be completed no later than: | 6/29/2012 |
| Discovery - requests to admit to be served no later than: | 5/1/2012 |
| All expert discovery to be completed no later than: | 8/15/2012 |
| Parties to meet to confer on scheduled for expert disclosures no later than: | 5/30/2012 |
| All counsel to meet face-to-face to discuss settlement no later than: | 7/13/2012 |
| Date recommended by counsel for alternate dispute resolution: | 5/10/2012 |

## TO BE COMPLETED BY THE COURT:

----------------------------------------------------------------------------------------------------------------------------

14. The next Case Management is scheduled for *May 30, 2012 @ 4:0 in Courtroom 20-c*

This ORDER may not be modified or the dates herein extended, except by further Order of this Court for good cause shown. Any application to modify or extend shall be made in a written application in accordance with paragraph 1(E) of the Court's Individual Practices and shall be made no less than two (2) days prior to the expiration of the date sought to be extended.

Paul A. Crotty
United States District Judge

*Paul A. Crotty*

Dated: New York, New York
*February 15, 2012*