UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                            :
SARKISSIAN MASON, INC. et al,              :
                           Plaintiffs,      :
                                                            :     11 Civ. 09472 (LGS)
               -against-                           :
                                                            :     <u>ORDER & OPINION</u>
ENTERPRISE HOLDINGS, INC.,                :
                           Defendant.   :
                                                            :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

       Plaintiffs Sarkissian Mason, Inc. ("Sarkissian") and AutoMatic, Inc. ("AutoMatic") bring this action against Defendant Enterprise Holdings, Inc ("Enterprise"), alleging that Plaintiffs brought a proprietary business proposal to Enterprise, which Enterprise allegedly misappropriated for its own use.  Plaintiffs allege five claims against Defendant:  breach of a nondisclosure agreement, estoppel, unjust enrichment, misrepresentation and misappropriation of a trade secret.  Defendant Enterprise moves for summary judgment.  For the reasons stated below, the motion is GRANTED as to all counts, and the case is DISMISSED.

**I. Background Facts**

**A. The Parties' Relationship and Negotiations**

       Defendant Enterprise is a holding company that through its subsidiaries owns and operates a fleet of rental vehicles under several brand names.  Plaintiffs are Sarkissian, a privately-owned digital marketing agency, and AutoMatic, its wholly owned subsidiary.  In October 2010, Sarkissian and Enterprise entered into a nondisclosure agreement ("NDA") that prohibited the public disclosure, use or copying of "Confidential Information" as defined in the contract and shared between the parties, while they conducted business and explored new business ventures.

Enterprise had an insight that they could "monetize" the results of a study (the "Polk Study") showing that consumers renting cars in the "insurance replacement market" are more likely to buy the cars they are driving than they otherwise would be because they are in effect test-driving the car. Consumers in the insurance replacement market are those whose insurance paid for a rental car replacement vehicle because their car was damaged or "totaled" in an accident, and therefore these consumers are very likely to be in the market for a car. In March 2011, Enterprise asked Plaintiffs, who were experts in digital marketing, to design a program that would use the insight of the Polk Study to enhance the value of Enterprise's insurance replacement rental fleet to manufacturers. The parties began discussions to develop a concept ultimately named the AutoMatic Buying Service.

Plaintiffs proposed to Enterprise, through a series of pitches embodied in five PowerPoint presentations, a way that automobile renters could use their mobile devices in rental cars to connect with automobile dealers, obtain quotes and ultimately buy automobiles. Plaintiffs made the presentations in St. Louis, Missouri, and presented a concept that essentially consisted of the following features:

1) Present an auto manufacturer with the marketing program, showing them that certain areas are ripe for "conquest" – namely a geographic area where the manufacturer could place its fleet with Enterprise in an effort to grow the manufacturer's market share through the insurance replacement market.

2) When the consumer arrives at the Enterprise rental company, tell them about the opportunity to buy the type of car they are driving.

3) Place a QR code on the car's key fob and/or elsewhere in the car that would lead the consumer to a website built and operated by AutoMatic. The website would contain marketing content "specifically designed to persuade them to purchase the same model car they were driving."

4) The consumer could then opt into the program and request a price quote for the vehicle. These "leads" would be sent to dealers who could contact the consumer to pursue a sale.

5) Consumers who opted in also would receive emails from AutoMatic providing them with information such as current sales on the model they drove.

      6)  AutoMatic would make money by selling the leads to the dealers.

Plaintiffs maintain that they were "always willing to structure the mobile engagement concept to permit renters to go directly" to the manufacturers' websites, but never presented such an idea to Defendant.

      In July 2011, Enterprise and AutoMatic discussed the contours of a potential agreement, exchanging a series of emails highlighting areas of consensus and disagreement.  A major issue was AutoMatic's insistence that their program and website be used in all Enterprise rental cars to the exclusion of any alternative.  Enterprise wanted manufacturers to be able to choose: "I feel we are all best served by supporting the paths the [manufacturers] wish to pursue.  With so many ideas competing for the [manufacturer's] marketing resources, we may find some want the simple engagement linked to existing Mobile [sic] sites while others will choose to pursue a deep engagement that moves lower funnel consumers to submit for a sales lead."  In July 2011, Enterprise told Mazda North American Operations ("Mazda") that Enterprise was working with Plaintiffs to develop the AutoMatic Buying Service.  This was after Plaintiffs already had discussed the AutoMatic Buying Service with Mazda.

      In August 2011, Plaintiffs sent Enterprise their first draft of a "Strategic Relationship Agreement" that would govern the development and roll out of the AutoMatic Buying Service.  The draft agreement was between Plaintiff AutoMatic and Enterprise, and recited as AutoMatic's chief obligation the development of technology using QR codes or other URL referencing technology that would allow consumers to access online information about their rental cars.  The technology also would collect information about consumers and their experience with the rental car.  The agreement proposed that Enterprise would install the QR codes at the direction of AutoMatic, and that Enterprise would provide AutoMatic with access to their manufacturing partners.  The agreement also contemplated an exclusivity provision that would prevent

Enterprise from creating any technology that was "similar to" or competed with the AutoMatic Buying Service concept. That provision added that nothing in the exclusivity provision was intended to prevent Enterprise from "instituting similar barcode scanning applications into its Rental Services or Rental Vehicles for other purposes."

The parties negotiated the contract, which they each understood was not binding without being signed. Enterprise continued to object to AutoMatic's exclusivity provision and broad access to its entire fleet, but the objections did not concern Plaintiffs' fundamental obligation to develop technology. In September 2011, as the parties continued their negotiations, they discussed the "need to sell [the AutoMatic Buying Service] together to [manufacturers] [rather than] trying to go in after or separately which would be too clumsy," and further discussed the need to push manufacturers to the AutoMatic Buying Service, rather than simply letting the manufacturer "send traffic to their [own] website from the QR code" as there would be "little value that way and no reason for" AutoMatic to build the AutoMatic Buying Service in that scenario.

The disputes proved intractable. In October 2011, Enterprise told Plaintiffs that "to the extent the [manufacturers] opt to have the renter QR code click go to their own website which doesn't offer something as unique, fun, different, and engaging" as AutoMatic could create, Enterprise had to offer manufacturers that flexibility. The parties never finalized the agreement, but continued to negotiate a letter of intent that would have allowed AutoMatic to pursue a pilot program with individual manufacturers. The parties were still negotiating the letter of intent even after Enterprise announced its own QR code-based service called "OnRamp," which offered manufacturers the alternative that AutoMatic had resisted – to have the renter click through to the manufacturer's website and advertising content rather than an enhanced website developed by AutoMatic.

On November 8, 2011, Enterprise announced OnRamp in a press release. OnRamp initially put QR codes in select Mazda6 vehicles. When a renter scans the QR code with their phone, the phone opens a mobile-optimized website built by Enterprise called OnRamp Concierge, which is specific to each make and model of car. OnRamp Concierge provides links to local attractions, local deals, and the location of nearby gas stations. OnRamp Concierge also provides a link to car manufacturers' websites or videos if the manufacturer elects to provide links to the material from the OnRamp Concierge. The OnRamp Concierge also links to more information about the car such as model information, pre-existing Enterprise websites for car rentals or purchases of used Enterprise vehicles, and links that send users to manufacturers' "dealer-finder" pages, where a user can put in their zip code or use their smartphone's GPS to locate a local dealer.

The parties continued to discuss a potential pilot program for the AutoMatic Buying Service after the release of OnRamp. In a November 15, 2011 email, Enterprise thanked AutoMatic for its "patience and persistence with this potential partnership," and attached a letter of intent hoping that it would provide AutoMatic "with the confidence to proceed toward" a pilot between AutoMatic, Enterprise, and Chrysler. That program never materialized as Chrysler never agreed to be part of the AutoMatic pilot program.

**B. Defendant's Existing Knowledge of Advertising Techniques Suggested by Plaintiffs**

Enterprise came to Plaintiffs with the results of the Polk study, and with the idea to use digital marketing to connect prospective buyers who were Enterprise rental car customers with automobile manufacturers. The Plaintiffs agree that all of the components of their proposal were widely and publicly available.

Before March 2011, when discussions about AutoMatic Buying Service began, Enterprise had used a number of advertising tools for the benefit of car manufacturers, including "post-rental emails and direct mailings (including discounts on the purchase of cars), countertop

5

advertising, custom key tags, and in car brochures." Enterprise already had discussed with Chrysler the Polk study, using post-rental emails and newsletters to promote Chrysler cars to customers, placing Chrysler cars in branches that serve insurance replacement customers, and using QR codes for smartphone applications that would lead to web addresses with vehicle details and call out new features of the car.[1]

QR codes were a common advertising tool prior to 2011. The EPA had proposed placing QR codes in cars for environmental information in 2010. Plaintiffs also admit that placing QR codes in cars is not Plaintiffs' confidential information. On January 27, 2011, Auto Data Direct publicly placed on Youtube a video describing the usefulness of putting QR codes on cars to link customers to information about a particular vehicle's history and to "dealers [who] can guide consumers directly to their website and provide additional details such as price, photos, dealership hours and other information necessary to help the consumer make a purchase decision." In 2010, about twenty percent of consumers obtained quotes online through a quote request tool on manufacturer websites, which the manufacturer would then sell as leads to local dealers.

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate only where the record before the court establishes that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange"*

---

[1] Enterprise presented Chrysler with an image of a QR code using the description "bar codes" in the written text, Plaintiffs argue that Defendant's use of the term "bar code" in their presentation to Chrysler indicates that Defendant did not pitch an idea with key-fob based QR codes to Chrysler. This is wrong. A QR code is a "two-dimensional bar code that is widely used to cause a Web page to download into the user's smartphone when scanned with a mobile tagging app." PC Magazine Encyclopedia, *available at* http://www.pcmag.com/encyclopedia/term/61424/qr-code.

*Prod. Liab. Litig.,* 517 F.3d 76, 87 (2d Cir. 2008).  A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party.  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 178–79 (2d Cir. 2008).  Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The non-moving party may not rely on "conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).  It cannot rely on mere denials or unsupported alternative explanations of its conduct.  *See S.E.C. v. Grotto,* No. 05 Civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**B.  Choice of Law**

The parties agree that Missouri law should govern all of the claims, and specifically that the Missouri Uniform Trade Secrets Act ("MUTSA") governs the misappropriation of trade secret claim.  (See Pls.' Brief at 17.)  The parties are correct.  The NDA by its terms is governed by Missouri law, which therefore also governs the claim alleging breach of the NDA.  (Pls.' Ctr. Stmt. ¶ 24.)   Under New York's choice of law rules, Missouri law governs the remaining claims.  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (New York's choice-of-law rules govern in diversity action).

A choice of law analysis is necessary only if the applicable substantive laws of Missouri (the domicile of Enterprise where negotiations took place) and New York (the forum state and domicile of the Plaintiffs) conflict.  *See Matter of Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 223 (1993).  Here, the only claim with such a conflict is the misappropriation of a trade secret claim.  There is no conflict as to the promissory estoppel claim, as the elements are the same in

both states. *Compare Clevenger v. Oliver Ins. Agency, Inc.,* 237 S.W.3d 588, 590 (Mo. 2007), *with Ripple's of Clearview, Inc. v. Le Havre Associates*, 88 A.D.2d 120, 122, 452 N.Y.S.2d 447, 449 (1982). There is no conflict as to the unjust enrichment claim, as both states apply the same principles. *Compare Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511 (2012), *with Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011). Finally, there is no conflict as to the fraud claim, as the elements of fraud are essentially the same in both states. *Compare Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 944 N.E.2d 1104, 1108 (2011), *with Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 765 (Mo. 2007).

Regarding the misappropriation of trade secret claim, New York applies a common law test. Under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999). Missouri on the other hand applies the Uniform Trade Secrets Act. Mo. Rev. Stat. §§ 417.450, *et seq.* ("MUTSA"). To establish a violation of MUTSA, plaintiffs must demonstrate (1) the existence of a protectable trade secret, (2) misappropriation of those trade secrets by defendants, and (3) damages. MUTSA at § 453(2). MUTSA, importantly, also preempts any non-contract based remedy, while New York law does not. *Compare* Section II.C.i, *infra, with Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 401 (1993). Finally, in Missouri the existence of a trade secret is a question of law, whereas in New York it is a question of fact. *Compare Lyn–Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo. Ct. App. 1999), *with Janien*, 82 N.Y.2d at 401.

In tort actions, if there is a conflict of laws, New York courts apply an "interest analysis," under which the law of the jurisdiction having the greatest interest in the litigation is applied. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir. 1992); *see also Babcock v. Jackson,* 12 N.Y.2d 473, 481 (1963). In trade secret cases the Second Circuit and its district courts have

8

often used the locus of the misappropriation to determine the locus of the tort and the state with the greatest interest. *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law because "the misappropriation, if any, apparently took place in New York"); *see also Fedders Corp. v. Haier Am. Trading, LLC*, No. 00 Civ. 5583, 2002 WL 519733 (S.D.N.Y. Apr. 4, 2002) (applying Illinois law where actual misappropriation of trade secret took place); *see also Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 720 (S.D.N.Y. 2002) (applying Israeli law to "unfair competition" claims where all "acts complained of" took place in Israel).

Missouri has the greatest interest in this case. Defendant has its principle place of business and its state of incorporation in Missouri, whereas Plaintiffs are Michigan and Delaware corporations with their principal place of business in New York. All sales pitches took place in Missouri. The alleged misappropriation with the roll out of OnRamp occurred in Missouri. Also, the Missouri choice of law clause in the NDA, while not applicable to non-contractual claims, indicates that the parties reasonably expected Missouri law to govern the question of confidentiality between them. *See Fedders Corp.,* 2002 WL 519733 at *3-4 (using the location where a confidentiality agreement was signed as a factor in the interest analysis); *see also Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 77 (1993) ("Our decision to apply Missouri law rests as well on another factor that should, at times, play a role in choice of law: the protection of reasonable expectations.") The only interest New York has in this case is that Plaintiffs' places of business are here. We therefore will apply MUTSA instead of the New York common law.

**C. Claims**

   **1. Misappropriation of Trade Secret**

In order to analyze the Plaintiffs' trade secret claim, reading the facts in the light most favorable to the Plaintiffs, the Court utilizes the Plaintiffs' proposal as stated in their five PowerPoint presentations and Rule 56.1 Counterstatement, as detailed above. That concept was

a "buying service using 'mobile engagement' technology to connect renters and vehicle manufacturers … for the purpose of generating new car sales for [manufacturers]." Plaintiffs proposed placing QR codes in Enterprise vehicles that renters could scan using their smartphones. The scans would lead renters to a website with engaging content specifically designed to persuade them to purchase the same model they were driving. The renters could then elect to link to local dealers who would provide price quotes. AutoMatic would make money by selling the leads to dealers.

Plaintiffs argue for a broader definition of their alleged trade secret. They argue that the concept of using a mobile device to connect renters to information about the car they drive is the critical concept, and that the details – the use of QR codes versus some other mobile technology; the role, functionality, content, owner or developer of the landing website – are unimportant. If Plaintiffs' seek to define the concept that broadly, the Court cannot find a trade secret, because it is insufficiently defined. Section I.A, *supra*. General categories of information are insufficiently specific to qualify as trade secrets. *See Mo-Kan Cent. Recovery Co. v. Hedenkamp*, 671 S.W.2d 396, 400 (Mo. Ct. App. 1984) ("The mere existence of some non-defined bidding structure does not establish a trade secret. [Plaintiff] provided the court with no evidence that its bidding structure…represented some novel or complicated approach…which could not easily be duplicated by others."); *see also Luigino's, Inc. v. Peterson*, 317 F.3d 909, 912 (8th Cir. 2003); *Porous Media Corp. v. Midland Brake Inc.*, 187 F.R.D. 598, 600 (D. Minn. 1999) ("Failure to identify the trade secrets with sufficient specificity renders the Court powerless to enforce any trade secret claim."). Further, the broad concept of connecting car consumers to information about a car through their smartphone – QR code or otherwise – was already in the public domain.

a. The Existence of a Trade Secret

"The existence of a trade secret is a conclusion of law based on the applicable facts." *Am. Family Mut. Ins. Co.,* 169 S.W.3d at 910. However, if the facts the Court uses to determine

whether information constitutes a trade secret are disputed, the finder of fact must first resolve those disputes. *Cerner*, 667 F. Supp. 2d at 1077; *see also Lyn–Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo. Ct. App. 1999). On this motion for summary judgment, all questions of fact are read in the light most favorable to Plaintiffs, but under Missouri law, the existence of a trade secret based on those facts is a conclusion of law.

Under MUTSA, a trade secret is a "formula, pattern, compilation, program" or other business idea that: "(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." MUTSA at § 450. Courts have used the following factors to determine whether information constitutes a trade secret under MUTSA: "(1) the extent to which the information is known outside of [the Plaintiff entities]; (2) the extent to which it is known by employees and others [within the Plaintiff entities] -- a factor not relevant here because of the small size of the Plaintiffs; (3) the extent of measures taken by [Plaintiffs] to guard the secrecy of the information; (4) the value of the information to [Plaintiffs] and [their] competitors; (5) the amount of effort or money expended by [Plaintiffs] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926-27 (E.D. Mo. 2010) (citing *Cerner Corp. v. Visicu, Inc.,* 667 F. Supp. 2d 1062, 1076-77 (W.D. Mo. 2009). These factors are not necessary or sufficient to find the existence of a trade secret, but rather are facts the Missouri courts have used to determine whether information satisfies the statutory definition of a trade secret. *Cerner*, 667 F. Supp. 2d at 1077.

### i. Whether the Information is Secret

The AutoMatic Buying System was not sufficiently secret to merit legal protection as a trade secret. All of the component parts of the idea were publicly known and in use before

Plaintiffs presented their proposal to Enterprise.  Even though the combination of ideas into a single program may have been novel, the proposal never progressed beyond a marketing concept, which was easily replicated.  Plaintiffs never developed the technology or logistics to implement the program, which at that later stage might have qualified as a trade secret.

Plaintiffs concede that the components of AutoMatic Buying Service were publically known.  Plaintiffs' expert describes AutoMatic Buying Service as based on "[data that was] generally available to Enterprise and the industry," a "widely available data set," and "data, knowledge, and know-how that was available to a multitude of other parties, including Enterprise."  Information that was widely known outside the Plaintiff entities included:  the information in the Polk Study, the placement of a manufacturer's vehicles in a conquest fleet, the value of placing manufacturer fleets in target insurance replacement markets, the use of QR codes in cars to link to information about the car, enabling consumers to use technology to obtain price quotes from dealers, the sale of leads to those dealers, and post-rental marketing.  Defendant presented many of these concepts to Chrysler before Defendant and Plaintiffs discussed the AutoMatic Buying Service.

Plaintiffs argue that their proposal as a whole is a trade secret, because the ideas taken together are "original, novel, and optimal" and that Enterprise never "understood 'the totality of the idea' before it was presented" by Plaintiffs.  Plaintiffs rely heavily on their marketing expert's opinion to support this argument.  Their expert, however, mistakes repetition for support.  He never states a basis for the opinion, nor any research he undertook to determine whether programs like the AutoMatic Buying System had been implemented or contemplated by others.

Nevertheless, accepting for purposes of this motion that Plaintiffs' marketing proposal was novel, it is not a trade secret because it was easily duplicated.  As detailed above, the inputs of the AutoMatic Buying Service were publicly known.  "In some cases, a novel or unique

combination of elements may constitute a trade secret." However, "mere variations on widely used [information] cannot be trade secrets." *Id.* (alteration in original). *Cerner Corp. v. Visicu, Inc.*, 667 F. Supp. 2d 1062, 1077 (W.D. Mo. 2009) (citing *Strategic Directions Group, Inc. v. Bristol–Myers Squibb Co.,* 293 F.3d 1062, 1065 (8th Cir.2002)). In some cases, where the public information is widely available – such as the names of individuals on a customer list – courts have found trade secrets because the information, despite being publicly known, was not easy to compile or duplicate given the amount of effort required to cull or gather the information. *See e.g. Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1106 (D. Kan. 2000).

In other cases, courts have distinguished between publically available advertising ideas, and the private technology developed to execute the ideas. In *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003), the Eleventh Circuit addressed an analogous situation of an advertising company taking publicly known concepts and claiming a trade secret. The Eleventh Circuit held that, while the technical printing techniques used to create special bottle labels were trade secrets, the conceptual ideas relating to the placement of a decodable message on the inside of a soda bottle were not trade secrets as they existed in the public domain. *Id.* at 1291; *see also Gen. Patent Corp. v. Wi-Lan Inc.*, No. 11 Civ. 6585, 2011 WL 5865194 (S.D.N.Y. Nov. 22, 2011) (rejecting a claim for trade secret despite plaintiff's claims that eighteen points including marketing plans and business plans "taken together" constitute a novel concept); *In re Parmalat Sec. Litig.,* 258 F.R.D. 236, 255 (S.D.N.Y.2009) (holding that marketing strategies are not trade secrets where the plaintiff "failed to explain what particular information about the particular ... marketing techniques are not already public [and] are not already commonly known in the industry").

13

AutoMatic Buying Service is a marketing plan like those in these cases, comprised of a collection of marketing ideas in the public domain pieced together in a novel, but easily duplicated, manner.

### ii. Whether the Information Has Value From Not Being Known or Readily Ascertainable

Under Missouri law, a secret must have value in order to be a trade secret, and it must derive value from not being known or readily ascertainable. MUTSA at § 450; *see also AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) *cert. denied*, 133 S. Ct. 138 (2012). Sarkissian and AutoMatic expended considerable effort in pitching and creating their proposal, which suggests it had value. However, no manufacturer agreed to participate in a pilot program of the AutoMatic Buying Service (which included the fully-fleshed out system with a third-party website), despite efforts to get Chrysler to do so. No matter the hypothetical revenue a marketing program might generate, an idea has commercial value only if there is a market for it and a willingness of its target audience to implement it.

Plaintiffs' marketing expert suggests various damages theories, based on lost revenues if the marketing concept had been executed. This also implies some value to Plaintiffs' proposal, although those damages also depend on the development of technology, adoption and implementation which never occurred. Whatever value was to be had in the AutoMatic Buying Service, it was not in the secrecy of the idea, but in the execution and the creation of a digital platform that would have generated more leads and more good will than Defendant was able to obtain through its own combination of publicly available concepts. The draft agreement that the parties never executed contemplated that the Plaintiffs' development of technology was at the heart of the parties' bargain. Plaintiffs argue that "[a]n analogy is the algorithms used by Google; highly unique, totally original, massively valuable." This might be plausible if Plaintiffs actually had developed the technology to implement AutoMatic Buying Service, but they did

not. Google's search algorithms most certainly are a trade secret and have value, but the idea of a search engine is not. This is why Plaintiffs' draft agreement centered around technological development for Enterprise, because that is where the value and difficulty lay.

Plaintiffs' AutoMatic Buying System does not meet the statutory definition of a trade secret because it does not derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." MUTSA at § 450. The components of the system are widely known, and the concept as a whole is of limited value because it is readily ascertainable. Thus, AutoMatic Buying System as an unexecuted concept is not a trade secret as a matter of law. Because of this finding we do not address the additional statutory requirement that a trade secret must be subject to reasonable efforts to maintain its secrecy, which was satisfied for the purposes of this motion. MUTSA at § 450.

### b. Misappropriation of the Trade Secret

Plaintiff claims that Enterprise misappropriated its idea for the AutoMatic Buying System with the roll out of OnRamp. Even if this Court were to find that there was a triable issue of fact regarding the existence of a trade secret, Plaintiffs cannot prove that the AutoMatic Buying Service was misappropriated by Defendant. *Reliant Care Mgmt., Co., Inc. v. Health Sys., Inc.,* No. 10 Civ. 38, 2011 WL 4342619 (E.D. Mo. Sept. 15, 2011) ("[T]o show misappropriation, plaintiff must present evidence that defendant used a trade secret…without the consent of plaintiff and that defendants used improper means to acquire the trade secret.") (internal quotations omitted). The undisputed facts are that the AutoMatic Buying System – that is, the detailed program that Plaintiffs proposed rather than the broad concept of any mobile engagement between car renters and manufacturers – was not misappropriated. The Enterprise OnRamp program was different in at least two important respects from Plaintiffs' proposal, and all of the elements of both programs were in the public domain.

One important difference is that Plaintiffs' proposal was that renters would connect to a web page with "engaging content specifically designed" to convince consumers to purchase vehicles. The websites linked to the OnRamp concierge page is [free of content] and provides links to websites of manufacturers, [dealers,] Enterprise and places of interest, unrelated to the car itself. The Plaintiffs' proposed landing page was itself a destination, while the Defendants' landing page was a stopping point to obtain directions to the intended terminus.

A second critical difference is that Plaintiffs' AutoMatic Buying System, by its terms was a "buying system." It was consistently pitched as targeted towards lower and mid "funnel" consumers – that is, those who are seeking out a car in more than a casual way. The Enterprise OnRamp program was not a buying system. OnRamp was the "simple engagement" option that Enterprise insisted on retaining for manufacturers, with a direct link to the manufacturer's website and advertising content, while the AutoMatic Buying Service was to be the "deeper engagement" option, with a more elaborate website designed to create sales leads for local dealers. The AutoMatic Buying System required customers to opt-in to the system, whereas OnRamp is not an opt-in system.

As AutoMatic told Enterprise, "For AutoMatic Buying Service, we need to have the customers go to our platform otherwise we will not be able to provide … content that the [manufacturers] want or provide leads to their dealers that they would be expecting from our solution." Enterprise responded that "any direction the [manufactuer] wishes us to pursue, we must be able to support. If they have creative [ideas] beyond existing [web] pages … we will push to connect them with AutoMatic."

OnRamp does not constitute misappropriation. OnRamp and AutoMatic Buying System are different concepts created from a similar collection of publically available ideas concerning the use of mobile devices to connect consumers to information about products they are using or considering purchasing.

16

### 2. Breach of the Non-Disclosure Agreement

Under Count I, Plaintiffs allege that Enterprise breached the NDA signed between the parties. The Court interprets the NDA pursuant to Missouri law looking to the plain meaning of the contract. *See Foam Supplies, Inc. v. The Dow Chem. Co.*, No. 05 Civ. 1772, 2007 WL 4210354 (E.D. Mo. Nov. 27, 2007). The parties, before carving out exceptions, defined Confidential Information between them as

> "information about … business information, including business plans, contracts and contractual relationships, customer names and related information, intellectual property, including technical drawings, know-how, formulas, processes, ideas, inventions (whether patentable or not), products, product development plans, services, forecasts, strategies and information."

AutoMatic Buying Service, while not a trade secret, is within this description. The parties then excluded from the definition of Confidential Information any information that: 1) "is or becomes part of the public domain through no direct or indirect act…of the Receiving Party;" 2) "was in the lawful possession of the Receiving Party prior to its disclosure to the Receiving Party by the Disclosing Party;" 3) was "lawfully and properly … disclosed to the Receiving Party by a third party without restriction on disclosure;" and/or 4) "is developed independently by the Receiving Party."

Under the plain meaning of the contract, Confidential Information excludes information Enterprise disclosed in connection with OnRamp and in discussions with Mazda. The Court relies largely on its analysis in the preceding section in holding that exceptions Two and Four above apply. OnRamp and Enterprise's discussions with Mazda used only information lawfully in the possession of Enterprise or publicly available prior to the disclosure of the AutoMatic Buying System to Enterprise. AutoMatic Buying Service was Plaintiffs' proprietary know-how, but the inputs into OnRamp were not novel, and they were not the same as the AutoMatic Buying Service. While Plaintiffs' expert concludes that Enterprise violated the NDA, that opinion is a conclusion of law not properly within the scope of expert opinion. *United States v.*

*Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("These cases establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."). Additionally, as to its discussions with Mazda, Enterprise did not disclose Plaintiffs' confidential information because Plaintiffs previously had disclosed the AutoMatic Buying Service to Mazda.

### 3. Common Law Torts

The remaining three counts allege tort claims of estoppel, unjust enrichment and fraud arising out of the same facts as the trademark claim. Each claim is preempted under MUTSA. MUTSA "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." MUTSA § 417.463(1). Thus, "civil claims that are derivative of a claim of misappropriation of trade secrets are preempted." *Foam Supplies, Inc. v. The Dow Chem. Co.*, No. 05 Civ. 1772, 2006 WL 2225392 (E.D. Mo. Aug. 2, 2006) (denying a claim for unjust enrichment as preempted under MUTSA); *see also Secure Energy, Inc.*, 2010 WL 1691454 at *2 (holding that preemption under MUTSA is determined by looking at the similarity of the underlying facts).

## III. Conclusion

For the reasons stated above, summary judgment is GRANTED as to all claims. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: July 15, 2013
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE